UNITED STATES of America, Plaintiff-Appellee,

v.

Otto ARCHBOLD–NEWBALL, a/k/a Otto Archibald, a/k/a "Otto" Alberto Ramirez-Betancourt, a/k/a Alberto Bravo, and Adolfo Gomez-Giraldo, a/k/a Adolfo Ramirez, a/k/a Adolfo Gomez, Defendants-Appellants.

No. 76–1737.

United States Court of Appeals, Fifth Circuit.

June 22, 1977.

Rehearing and Rehearing En Banc Denied Sept. 7, 1977.

Sky E. Smith, Miami, Fla. (Court-appointed), for Archbold.

Robert L. Moore, Miami, Fla., for Ramirez-Betancourt.

William P. Cagney, III, Miami, Fla., for Gomez-Giraldo.

Robert W. Rust, U.S. Atty., Miami, Fla., Ronald W. Rose, U.S. Dept. of Justice, Los Angeles, Cal., Marty Steinberg, Dept. of Justice, Miami, Fla., for plaintiff-appellee.

Before GOLDBERG and HILL, Circuit Judges, and KERR,* District Judge.

JAMES C. HILL, Circuit Judge:

This tale involves international drug smuggling surreptitious police tactics, high finance and an ocean going rendezvous—ingredients which would undoubtedly make a successful modern day melodrama. The sub-plot of the story, with which we are principally concerned, reveals a continuing effort by the actors to avoid the consequences of flouting the criminal laws of this country. The well-staffed cadre of conspirators responsible for this web of lawlessness are here represented by only three of their number.[1]

The appellants, Otto Archbold-Newball ("Archbold"), Alberto Ramirez-Betancourt

---

\* Senior District Judge of the District of Wyoming, sitting by designation.

1. The conspiracy charged in Count I of the indictment alleged that 18 defendants, including appellants, from April 7, 1974, until December 17, 1974, agreed to import marijuana and cocaine into the United States with intent to distribute it. Count II also charged appellants with importing, on June 23, 1974, and aiding in the importation of 28 kilograms of cocaine and 2,000 pounds of marijuana into the Southern District of Florida from outside the continental limits of the United States.

("Ramirez") and Adolfo Gomez-Giraldo ("Gomez") were convicted of conspiring to import and to possess cocaine and marijuana with the intent to distribute them. (Count I). They were also convicted of aiding and abetting the importation of cocaine and marijuana into the United States on or about June 23, 1974 (Count II). The case was tried and the convictions were obtained before a jury in the United States District Court for the Southern District of Florida. The court sentenced each appellant to consecutive ten year terms of imprisonment on both Count I and Count II to be followed by consecutive parole terms of three years.

## I. The Facts.

The events leading to this appeal are intriguing and, at times, incredible. Before we unravel the bizarre script of this unrealistic but true chronicle of events, we must divide the rendition into two portions, representing the two phases of the conspiracy. The first portion involved members of a drug smuggling ring headed up by one Richard Cravero ("Ricky"). In that portion of the conspiracy, a government informant, William Orr,[2] led federal agents to a house in which Cravero and three of his co-conspirators, Chandler, Cook and Willits, were arrested with various drugs in their possession.

The second portion of the conspiracy began on November 4, 1974, when a Drug Enforcement Administration ("DEA") agent, Jack Short, and another agent arrested one William Andries on an outstanding warrant from New York in an unrelated case. Andries agreed to cooperate with them after he was promised that his cooperation would be made known to appropriate judicial authorities. Andries began to tell the agents about the narcotics operation which he, Cravero and Chandler had operated. Using telephone numbers of suspected Colombian drug smugglers furnished by the government agents, Andries called appellant Archbold, posing as a buyer of narcotics. Andries intended to introduce Short into the drug operation as a prospective buyer. Thereafter, agent Short traveled with Andries and Andries' girlfriend[3] to Martinique on November 15, 1974, where Short had a series of conversations and meetings with appellants. Appellants are challenging, among other things, the admissibility at their trial of various statements which they made to Short while he was in Martinique. With this brief introduction and overview in mind, we proceed with a more detailed explanation of both portions of the conspiracy.

### A. The Voyage of the "Yankee Clipper."

On May 2, 1974, William Orr went to Cravero's residence to discuss certain debts which Orr owed but was unable to pay. After explaining the purpose of his visit to Rose Lauro, an unindicted co-conspirator who was in Cravero's house at the time, Orr arranged a meeting with Cravero. When they met later that night, Cravero told Orr that he needed a boat and asked Orr to obtain one. Cravero later told Orr that he needed the boat so that he could go to the Bahamas that weekend to pick up narcotics. Orr was to be paid $10,000 for making the trip with Cravero. Orr subsequently rented the boat "Yankee Clipper" for $1,000. In the meantime, Eugene Cella, another co-conspirator acting as a nominee owner for Cravero, had bought a forty-foot diesel powered boat, the "Tempest XI" for $42,-000. Although the Yankee Clipper was gasoline-powered, Cravero instructed Orr to obtain 50 gallons of diesel fuel in canisters for "another boat." On June 22 Cravero

---

**2.** Orr was paid in excess of $42,000 for his services to the government over a nineteen month period. Nonetheless, we reject appellant Gomez' suggestion that "this Court [should] consider a prophylactic rule to prevent these "guaranteed" bounty hunters from further proliferation." The risks undertaken by Orr were high and there is no indication in the appeal that he had been promised a specific sum to convict a particular person. See United States v. Garcia, 528 F.2d 580, 586 (5th Cir. 1976), cert. denied, 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976).

**3.** The woman, known as Aurora or "Donnie," was Andries' wife-to-be.

and Orr left for the Bahamas on the Yankee Clipper. Cravero told Orr that they would rendezvous with a Colombian boat which would be carrying 5,000 pounds of marijuana, and that they would pick up a suitcase of cocaine and as much marijuana as their boat would hold.

On the way to the Bahamas, Cravero repeatedly used the radio in fruitless efforts to contact "Ronnie" (Chandler), "Toad" (Miller) and "Otto" (Archbold) to direct their boat to switch from "Position 2" (Orange Cay) to "Position 1" (South Riding Rock). After reaching South Riding Rock in the early morning hours of June 23, Cravero used a green signal light in a further unsuccessful attempt to contact the other boat. At that point, Cravero was unaware that Chandler and the others had already used the same signal to make contact with the Colombians and Archbold.

After their unsuccessful attempt to locate the Colombian boat near South Riding Rock, Cravero and Orr went to Bimini, where Cravero telephoned Florida to find out that Chandler had already picked up the cocaine and marijuana using the forty-foot boat.[4] Cravero told Orr what had occurred, and stated that because of this Orr would not receive the full $10,000, promising instead that he would get several thousand dollars, an ounce of cocaine and several pounds of marijuana. Cravero told him that he had paid $100,000 in advance to "the Colombians" but would receive cocaine worth much more than that because they trusted him based on past dealings. The Yankee Clipper docked in Florida late on June 23 and, before they parted, Cravero told Orr to contact him in two or three weeks regarding payment.[5]

B. *The Burning of the "Tempest XI."*

In the early morning hours of July 2, the Tempest XI was discovered aground and on fire several miles south of Jupiter, Florida. In the debris investigating officers found several fuel containers and the remnants of a large amount of marijuana. The officers also found approximately 3,000 pounds of marijuana secreted on a nearby island. At about the same time, on July 2, a taxi driver picked up Cravero and two companions near the burned boat. The taxi driver testified that they took a circuitous route to Cravero's house, where he dropped Cravero and was paid with soggy money. The destruction of the Tempest XI had been carried out by Cravero himself.

One of the government's witnesses before the district court, Bobby E. Miller ("Toad") corroborated the testimony of several other witnesses and supplied the background to the Cravero drug transactions. After stating that he had worked in the narcotics business with Cravero from April, 1973, until November, 1974, Miller explained what had happened on the Tempest XI while Orr and Cravero made their fruitless trip and returned to Florida. Miller explained that Cravero had asked his help in May, 1974, in receiving an expected narcotics shipment from Colombia. Miller assisted Cravero in locating a house in Jupiter, Florida to unload the marijuana for eventual distribution to New Jersey and New York. In addition, Miller inspected the Tempest XI in June, 1974, to determine if Cravero should buy it to haul eight thousand to nine thousand pounds of marijuana.

Miller also testified in detail about what happened during the rendezvous near Bimini. Although Chandler and the others picked up twenty-eight kilos of cocaine and five to seven thousand pounds of marijuana when they made the transaction with the Colombians, Chandler gave Archbold only $10,000 in cash at that time. Chandler and his accomplices then took the boat to the house in Jupiter, Florida where they left

---

4. Chandler and three others had gone to South Riding Rock, near Bimini, and met with the Colombian boat and appellant Archbold to pick up the marijuana and cocaine. From South Riding Rock, the two boats traveled to Orange Cay, another island where Archbold and the Colombians had stashed the narcotics. The Colombians then loaded the drugs onto the Tempest XI and the boat returned to Jupiter, Florida.

5. Cravero later paid Orr $1,000 for his services. See *infra* at 670.

the marijuana on the boat and drove back to Miami with the cocaine. They were to give the cocaine to a man named Norm at a designated meeting place, but Miller testified that the meeting never occurred. Miller stated that he later talked to Cravero in early July and found that Cravero had had to burn the Tempest XI and hide the marijuana nearby.[6] Miller testified further that Cravero told him in late July that Chandler's arrest in New Jersey had caused him to lose all of the cocaine.[7]

### C. Meeting at the Ranch House Restaurant.

About three weeks after the Yankee Clipper trip, Cravero contacted Orr and arranged a meeting at the Ranch House Restaurant. Orr met with Cravero, Willits, and Chandler at about 7:00 p. m. on the evening of July 14. Cravero said that he had intentionally burned his own boat near Palm Beach, after it ran aground, and that he had lost all the marijuana. Chandler was angry at this loss but Cravero assured him that the loss did not matter because he had gotten the suitcase full of cocaine off the boat before the fire. At this meeting, Cravero gave Orr $1,000 and promised more in the future, but said there was too much "heat" to deliver the promised narcotics to Orr. Acting on information supplied by Orr, federal agents had placed the restaurant under surveillance on July 14, and had observed Cravero and Chandler enter and leave the restaurant. The agents followed Cravero and the others to the residence of one Marianne Cook and observed them enter the house. Later that night Cravero called Orr and asked him why the "heat" had followed them from their Ranch House meeting. After this call, the agents decided to enter the house and arrest Cravero and Chandler, for whom arrest warrants were outstanding.

### D. The Arrests and Seizures at the Cook Residence.

When the agents entered the house they found that Chandler had a loaded automatic pistol, but Cravero, Chandler and Willits were all arrested.[8] During the course of the arrest the agents found cocaine and paraphernalia used in the packaging and processing of narcotics. Later on the morning of the 15th, a warrant authorizing the search of the Cook residence was obtained which, when executed, led the agents to a number of packets containing cocaine and marijuana cigarettes in the house.

Chandler was released from custody after his arrest at the Cook residence, but he was again arrested on July 28, 1974, at Ship Bottom, New Jersey. He was arrested with three other individuals, and thirty pounds of cocaine were seized from their motel room.[9] In addition, the agents found a slip of paper in Chandler's wallet which had written on it the name of "Otto," the abbre-

---

**6.** John and Douglas Manson, who had sold the boat to Eugene Cella, later identified the burned-out remains of the Tempest XI. Cravero had engine trouble with the boat and had to set it afire after unloading all but three or four hundred pounds of the marijuana.

**7.** When Chandler was arrested, on July 28, 1974, he and his companions had in their possession approximately thirty pounds of cocaine.

**8.** Cravero, Chandler and Cook were all convicted of various narcotics-related crimes, and their convictions were upheld by this court on appeal. See United States v. Cravero, 545 F.2d 406 (5th Cir. 1976), petition for reh. denied, 545 F.2d 420, cert. denied, —— U.S. ——, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). For a more detailed discussion of the search and arrests at the Cook residence see id. at 412–18 and 420–

21. (The court's panel decision in Cravero was first published in the advance sheets at 536 F.2d 637 and was later withdrawn from the bound volume by order of the court).

**9.** Prior to the trial, appellant Ramirez filed a motion to suppress the evidence obtained as a result of this seizure as well as the seizures at the Cook residence. The district court permitted appellant Gomez to adopt this motion and to offer the suppression hearing testimony taken at the earlier Cravero trial. The court, however, denied appellants' motion to suppress on the ground that Gomez and Ramirez lacked standing to challenge the legality of both searches. In this appeal, appellants challenge only the seizure at the Ship Bottom, New Jersey motel. See discussion in Part IV, infra.

viations "A.D." and "A.L.B." as well as several numbers.

### E. *The Meetings in French Martinique.*

The Colombians were not discouraged from their criminal activities by the arrest of the Cravero kingpins. The second portion of the conspiracy began when agent Short traveled to the Bahamas with Andries and his girlfriend. Arrangements for the trip were made sometime between November 3, 1974, and November 10, 1974, when agent Short telephoned Archbold from New York. During that conversation, Short gave Archbold his telephone number in South Florida. On November 10, 1974, Archbold called agent Short at that Florida number and Short made a tape recording of the conversation. The gist of the taped conversation, which was played to the jury at trial, was that agent Short (posing as a buyer of narcotics) was going to Grand Cayman to meet with "Alberto," "Aldolpho" and "Archbold" to arrange for a delivery. During the conversation, Short asked Archbold why the meeting could not be in St. Thomas rather than Grand Cayman. Archbold replied that "Alberto have (sic) practically the same problem as what Billy have (sic)."[10] Thereafter, in a series of six meetings arranged by Andries, Short was introduced to the appellants and, without undue delay, their discussion turned to the subject of drug importation. The statements made by the co-conspirators during these meetings were related at trial in the testimony of Short, Andries and Donnie. In the first meeting, Short was introduced to the appellants and talked briefly with them when they arrived at the Hilton Hotel in Martinique. No incriminatory statements were made by the appellants at this meeting.

In the second meeting in Martinique, agent Short met with the three appellants, with appellant Archbold acting as an interpreter—translating English to Spanish and Spanish to English. Gomez and Ramirez told Short that Andries owed them several hundred thousand dollars from prior narcotic deals, and that this amount included the narcotics sent to Cravero. Short determined that Andries alone owed them about $10,000, and he indicated that he would be willing to pay this amount, but that he would not pay Cravero's debts. They agreed to deal with him on this basis. Ramirez offered to sell Short 20 kilos of cocaine for $25,000 per kilo and suggested a delivery schedule of 20 kilos to be delivered every 15 days. During subsequent conversations with the appellants, Short continued to press for a lower price for the cocaine, but Ramirez insisted upon $20,000 per kilo. The appellants continued to discuss price and methods of payment with Short, and they again stated that Cravero owed them over $200,000. Ramirez explained that he had been to Miami to collect from Cravero when Chandler was arrested in New Jersey. Cravero, however, told Ramirez that he had only $200,000 which he could use either to pay Ramirez or to bail out Chandler. Ramirez said that he told Cavero to get Chandler out of jail, but he later learned that Cravero had not done so.

Ramirez then asked, initially, for a $200,000 advance from Short, but he later agreed to send the first shipment on consignment. Ramirez asked whether Short wanted any marijuana, and Short declined. Ramirez agreed, noting that they had had problems with the last delivery as it contained both cocaine and marijuana. During one of their conversations Archbold admitted being on the boat that had delivered the narcotics. He stated that only 28 kilos were delivered, rather than the promised 50. In another meeting, Short and the others discussed plans for the date of the first shipment of cocaine into Miami, the mode and amount of payments, and to whom payment would be made and where. They agreed that Ramirez would leave Martinique and go directly to Colombia to begin preparation for the cocaine shipment and that Gomez and Archbold would go to Panama to await Short and his money. In addition to the

---

**10.** Billy's "problem," and that of Ramirez, was that they were wanted by authorities within the United States. Billy, of course, is Andries. *See* discussion in Part V, *infra.*

discussion of future dealings which occurred in this meeting, the conversation also dealt with past events. Gomez told Short that he had traveled to New York about one week after "the delivery that came to Cravero and Chandler and that Cravero's boat with "the marijuana" burned while Gomez was in New York. Gomez told Short that Cravero had paid Gomez "about one hundred and something thousand dollars for the cocaine and marijuana they sent them." Archbold told Short that he too had come to the United States and that he and Ramirez were staying at the Fontainebleau when Chandler was arrested in New Jersey. Archbold also said that he had met with Cravero in October, 1974.

During this same time frame, Ramirez told Short that Cravero had paid him about $6,000. Gomez, who was also present at this time, told Short that Cravero had paid him about $38,000 of the $44,000 which Andries owed him from a previous deal. Ramirez also made statements in Martinique to Andries and to "Donnie." He told Andries, in Donnie's presence, that Cravero had paid him "very little money" for the "last deal." He also told Donnie that the "very little" payment which Cravero made to him was for 28 kilograms of cocaine and a quantity of marijuana.

Later that day, Short had a conversation with Archbold about Archbold's delivery of cocaine and marijuana to Chandler in the Bahamas. Archbold told Short that Cravero and Chandler were supposed to receive fifty kilograms of cocaine, but that "because they, Chandler and Cravero, kept calling down there, Mr. Ramirez and Mr. Gomez decided to go ahead and send what they had available, which was 28 kilos." Archbold also told agent Short that Alfredo Gomez, the father of (defendant) Adolfo Gomez, was the "boss" and that he put forward Ramirez to handle the business because Ramirez had "the confidence of the father . . . and more experience."

In their final meeting, Short asked for some assurances from the appellants about the identity of his new business associates. He had Gomez and Archbold write on a piece of hotel stationery their names, addresses and telephone numbers, as well as Gomez' father's name and the name of his business in Panama.[11] The document, on which Short also wrote Ramirez' name, was offered and received into evidence. Ramirez also gave his telephone number in Barranquilla, Colombia. Short testified at the trial that Ramirez told him to be careful with this piece of paper because he, Ramirez, was wanted in Puerto Rico and New York.

Shortly after this meeting, the defendants were arrested by French authorities upon a statement by agent Short to the authorities concerning his conversations with them during the past two days. Short left Martinique on November 21, 1974, and on December 3 signed a new complaint before Judge Roettger in Fort Lauderdale charging these three defendants with conspiracy to import cocaine and marijuana into the United States. Although this complaint was virtually identical to the first one, Short increased the time period of the alleged conspiracy from May 1, 1973 through November 2, 1974, to May 1, 1973 through November 22, 1974, so as to include the statements that he had received from the defendants during the two days of meetings in Martinique.

## II. The Admissibility of Incriminatory Statements Made in Martinique.

Both Gomez and Ramirez, as well as Archbold by adoption, contend that their surreptitious interrogation, after the issuance of a complaint and arrest warrant, violated their rights under the fifth and sixth amendments to the United States Constitution. They argue that since they were in effect "in custody" on the island of Martinique, their statements to Short were inadmissible because they were not given

11. Short told Gomez that he wanted the address and telephone number of Gomez' father's business so that he could claim to be removing $200,000 from the United States for the pur-

pose of investing in the business. The money, of course, represented the amount which would have been required to consummate their first narcotics transaction.

full *Miranda* warnings. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant Gomez suggests that the Government's motive for having Short question and discuss various drug transactions with the appellants was to obtain the assistance of the French authorities in securing their arrest. He notes that an agent of the French National Police, Ravanello, accompanied Short to Martinique. Once they arrived, Ravanello told Short that, under French law, Gomez and the others could not be arrested in Martinique unless they violated French law while they were there. Thus, rather than arrest the appellants on the strength of the provisional arrest warrants in their possession, the Government agents, according to Gomez, created a new crime for the appellants to participate in. Gomez claims that the meetings with the appellants were used to interrogate each of them, in a surreptitious manner, about the pending charges against them in the Southern District of Florida. Recognizing that the "in custody" requirement of *Miranda* is crucial to his case, Gomez attempts to show that he was, in fact, in custody during his encounter with agent Short on Martinique.

This court has held that, in determining the degree of custody requisite for the invocation of *Miranda* protection, it would employ a case by case evaluation rather than any set rule. *United States v. Carollo,* 507 F.2d 50 (5th Cir. 1975), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975). In *Carollo,* this court set forth the four significant factors to be relied on in making this determination:

> These are, (1) probable cause to arrest, (2) subjective intent of the police, (3) subjective belief of the defendant, and (4) focus of the investigation. [*Brown v. Beto,* 468 F.2d 1284, 1286 (5th Cir. 1972); *United States v. Phelps,* 443 F.2d 246 (5th Cir. 1971)]. 507 F.2d at 52.

Even the most superficial analysis of the four *Carollo* factors, as applied to this case, shows that appellants' argument is totally without merit. Although factors (1) and (4) would indicate the desire of the government to put these appellants into custody at some point, factors (2) and (3) simply do not indicate the degree of custody contemplated by *Miranda.* With respect to factor (2), Gomez argues that Short intended to deprive him of his freedom in a very significant way by somehow preventing his departure from Martinique.

Short had testified that although he discovered that he could not force the Martinique government to keep Gomez on the island on the strength of the arrest warrants already obtained, he made every effort to assure that Gomez would not be allowed to leave Martinique before his extradition. It is obvious, however, that Gomez remained on the island because he wanted to make a drug deal, not because agent Short was restraining him from leaving. To hold that such an attenuated and theoretical degree of restraint meets the "in custody" requirement of *Miranda* would render the rule useless. If an undercover agent, such as Short, had to give the *Miranda* warnings to suspects such as the appellants in this case, he would obviously be unable to carry out his investigation. Moreover, the *Miranda* rule is intended to prevent coercive interrogation and to assure the voluntariness of any incriminatory statements. These objectives were met in this case even though the *Miranda* warnings were not given.

Perhaps the third factor enunciated in *Carollo*—the subjective belief of the defendant—best illustrates why the "in custody" requirement of *Miranda* has not met in this case. In *Carollo,* the court noted that "Carollo was never told that he could not leave; in fact he walked away several times during his conversations with the ATF agents to conduct restaurant business. Carollo's subjective belief about his freedom of action was indicated by his willingness to help the agents while conducting business as usual." Since these appellants, like *Carollo,* held no subjective belief that their freedom was being restrained, it can hardly be said that they were being deprived of their freedom of action in any significant way.

With obvious sincerity counsel for appellant Gomez asserts that the insinuation of an undercover law enforcement officer into the meeting of the defendants in Martinique, and his suffering and encouraging them to discuss their illegal activities without telling them that he was a law enforcement officer, though he well knew them to be conspirators, was just not fair.

Indeed, the record discloses that agent Short was misleading his quarry. Unknown to the conspirators, agent Short had already determined that the appellants had been engaged in a massive drug smuggling operation. Warrants had been obtained for their arrest, but the warrants had not yet been executed. Short was investigating the conspiracy, and the investigation had developed so far that he knew who it was that he should investigate further.

In what appellants apparently view as the "game" of law man versus lawbreaker,[12] the rules under which agent Short was operating really didn't give appellant and his associates a "fair" chance of success. Were this transaction a "game," appellants' argument would be persuasive. Were this court something of an "NCAA Rules Committee" seeing to it that the "offense" and the "defense" each had a fair chance of prevailing upon the gaming fields, we ought to revise the rules more in keeping with what appellant seeks.[13] This business is not a game and this court is not prescribing rules for a fair contest. In the ongoing clash between those who would break our nation's laws and those who seek to enforce the law, it will be quite satisfactory if the former receive the ball in their own end zone with no reason to believe that they can hope to advance it one yard.

Yet there are restraints upon those who seek to attain that favorable position. Those restraints appear in the Constitution, the Bill of Rights, other amendments, and the laws made pursuant thereto. They are not promulgated for the purpose of insuring that the guilty shall be given a fair chance of escaping detection. They safeguard the liberties of the people against tyranny. The blessings of liberty are of such value that, in order to safeguard them, the people are and have been content to restrain even the detection of crime. If, *consistent with those restraints*, those who serve the people as law enforcement personnel can gain the overwhelming upper hand over those who set about to break the law, justice is served, our Constitutional form of government is protected and, to that extent, preserved.

The *Miranda* rule is a statement by our Supreme Court of such a constitutional restraint upon governments' efforts to detect crime. It evolved from a long history of various activities which have been denounced, but though the activities be varied, the Constitutional purpose furthered by their separate denunciations remains constant.

For example, it was once thought expedient in extracting confessions from suspects to "give them the third degree." Quite likely, long hours without sleep, the glare of an intense light, and the pain of beatings with a rubber hose resulted, with some expedition, in persuading even the guilty

---

12. Youthfully referred to as "cops and robbers."

13. The football player who, after scoring a touchdown, holds the ball in the air to taut his opponent is no less enthusiastic about his sport than Cravero was about his "game" with federal authorities. Orr testified that Cravero bragged to him about outsmarting the authorities after he learned that Chandler had picked up the drugs from the Colombians and Archbold:

> Q. During that trip back to the United States on the Yankee Clipper, did the subject of federal authorities ever come up?

> A. Yes. He said he was real proud of how he outsmarted the federal authorities. He said he was going to take a picture of hisself (sic) sitting on his cocaine and send it to the federal authorities. He thought it would be awfully funny that when he got back to the United States, if some type of federal authorities tried to search him and arrest him and they wouldn't find any narcotics on the boat. He said that he was going to send that picture to them of the drugs and he was really proud of how he outsmarted them.

truthfully to confess his wrongdoing. Furthermore, a citizen innocent of any crime could well be persuaded to fabricate whatever "confession" was being sought to bring such a proceeding to an end. Neither was to be thus compelled to give testimony against himself under the fifth amendment and neither may be so compelled today.

The compulsion and coercion of the "third degree" is apparent. Yet, absent the bright light and rubber hose trappings of such a discredited proceeding, citizens may be coerced into loss of their rights under the fifth amendment. Such occasions are similarly condemned. The impact of arrest, to one unfamiliar with our basic charter, may produce a feeling of helplessness to resist the questions of the arresting officer or his associates. Before the officer can, in such a situation, question the arrested person, the coercive effect of his status must be removed. Thus, it has been judicially established as a prerequisite to interrogation of an arrestee that he be advised that he is not under coercion to talk even though he be under arrest. *Miranda, supra.* Once the threat of coercion has thus been removed, no rule prevents the taking of a confession or other incriminatory statement or its later use in court. The law does not denounce clever or imaginative police work within the bounds of the Constitution even though its result is that a lawbreaker really has no fair chance of escaping prosecution. The law does denounce coercion of an arrested person to provide information he would not voluntarily provide. Even though such coercion may be more subtly applied than in the "third degree" setting, it is, nevertheless, unlawful, wherever found and however applied. In this case, agent Short used imaginative methods to create the occasion for his quarry to speak in his presence, but when they spoke they did so voluntarily and under no compulsion or coercion.

The appellants also contend that their interrogation occurred without the assistance of counsel, in violation of the principles announced in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The appellants claim that Short's questioning took place while they were "constructively under arrest" and after a complaint had been filed and an arrest warrant had been issued. These facts, they allege, subjected them to the criminal justice system in a manner which required assistance of counsel. It is well settled, however, that an accused is entitled to counsel only when the prosecution of his case has reached a "critical stage." *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Furthermore, as noted in *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), "[t]here is no constitutional right to be arrested." Thus, the government was entitled to continue gathering evidence, even though a complaint and an arrest warrant had been issued.

### III. *Hearsay Statements of Co-conspirators.*

The appellants next contend that statements made by various co-conspirators on the island of Martinique should not have been admitted, as an exception to the hearsay rule, because the conspiracy had ended before they were made.[14] Appellant Ramirez also argues that the statements made by Gomez and Archbold in Martinique were not in furtherance of the conspiracy which the indictment charges. He contends that the charged conspiracy had as its objective

---

14. Appellant Gomez identifies three areas of testimony containing particularly incriminating statements which he believes were made after the conspiracy ended: (1) the testimony of "Donnie" Andries, concerning Ramirez' statement to the effect that Cravero still owed *them* several hundred thousand dollars for prior cocaine deals; (2) Short's testimony relating his conversation with Archbold on November 10, 1974, wherein arrangements for a meeting between the appellants and Short were discussed; and (3) Short's testimony regarding his conversation with co-defendant Archbold, wherein Archbold admitted his role in the delivery of cocaine and marijuana on June 22–23, 1974, to the Cravero group and that Gomez and Ramirez had sent the cocaine to Cravero. This is also the conversation wherein Short elicited from Archbold statements to the effect that Gomez' father was the group's "boss" and that he and Ramirez stayed in the Fontainebleau Hotel in Miami.

the importation of narcotics upon the request of the Cravero organization but that agent Short, although posing as a narcotics purchaser, was not a member or agent of the Cravero organization and, thus, that the statements made to him were not in furtherance of the conspiracy. In fact, Ramirez argues, Short specifically disclaimed any association with Cravero and any responsibility for Cravero's debts.

The Government contends, and we agree, that the appellants' statements to agent Short easily fall into the co-conspirator exception to the hearsay rule. *United States v. Crockett,* 534 F.2d 589 (5th Cir. 1976); *United States v. Martinez,* 481 F.2d 214 (5th Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974), Fed.R.Evid. 801(d)(2)(E). As indicated by the Government, the statements were made not as "idle chatter," but as a means of explaining their operation and to illustrate their ability to deliver the narcotics in the future. Indeed, the statements, which were made prior to indictment, indicated the desire of the appellants to continue in the conspiratorial role of supplier. Furthermore, they were attempting to collect for the previous load of narcotics that they had sent to Cravero. The indictment charges appellants with conspiring to import "divers quantities" of controlled substances into the United States from April 7, 1974 until the indictment was returned on December 17, 1974. Thus, the statements made by the appellants in Martinique may have been only a small part of the larger conspiracy, but there can be little question that they were in furtherance of the overall conspiracy charged in the indictment.

In addition to arguing that the co-conspirator exception to the hearsay rule is inapplicable, appellant Ramirez alleges that there was no evidence, other than the hearsay statements of his co-conspirators, to link him to the conspiracy. The glibness of this allegation is appalling. There is no question that a witness can testify to declarations made to him by a co-conspirator only if the government by independent evidence establishes a prima facie case of the existence of a conspiracy and introduces at least "slight evidence" to connect with the conspiracy both the declarant and the defendant against whom the statement is introduced. The latter requirement is satisfied if the government makes "a showing of a likelihood of an illicit association between the declarant and the defendant," *United States v. Cravero, supra* at 418–19; *United States v. Lawson,* 523 F.2d 804, 806 (5th Cir. 1975); *Park v. Huff,* 506 F.2d 849 (5th Cir. 1975) (en banc), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *United States v. Oliva,* 497 F.2d 130, 133 (5th Cir. 1974). The independent evidence linking Ramirez to the conspiracy is more than slight; it is overwhelming.

During his conversations and negotiations with three of the government's principal witnesses—Short, Andries and Donnie—Ramirez detailed the extent of his participation in both the importation of narcotics to the Cravero organization and the continuing conspiracy charged in the indictment. His incriminatory admissions, as related at trial in their testimony, were not hearsay. *United States v. Hicks,* 524 F.2d 1001 (5th Cir. 1975), *cert. denied,* 424 U.S. 946, 96 S.Ct. 1417, 47 L.Ed.2d 353 (1976); McCormick, *Handbook on Evidence,* § 262 (2d ed. 1972); Fed.R.Evid., 801(d)(2). Ramirez told Short that Cravero had paid him only $6,000, and he told Andries that Cravero had paid him "very little money" for the "last deal." In addition, Short's testimony indicates that Ramirez actively participated in the negotiations with Short for the proposed purchase and sale of Colombian narcotics.

Ramirez also told Short that he had been to Miami to attempt to collect the money Cravero owed him. It was on this occasion that Cravero told him that he had only $200,000 and that the money could be used either to pay Ramirez or to bail Chandler out of jail. (Ramirez told Cravero to use the money for Chandler's bail, but Cravero apparently failed to do so). In addition to Ramirez' own statements, there was also independent evidence that Ramirez had been in Miami at approximately the same

time that Chandler was arrested in New Jersey. Thus, we find without merit Ramirez' claim that he was not linked to the conspiracy by independent evidence.

■ We also reject appellant Gomez' argument that the admission of certain statements by his co-defendants violated his rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton* the Supreme Court was concerned with the prejudice inherent in the introduction of a confession which had been made by one co-defendant and which implicated another, non-confessing co-defendant. In the absence of an established exception to the hearsay rule, the confession could not have been offered against the non-confessor even though the jury had heard the statement as part of the prosecution's case against the confessor. The Supreme Court held that limiting instructions, the normal means of insuring that such inadmissible evidence is not considered by a jury, were insufficient to cure the prejudice created by the co-defendant's confession.

Since in this case there is another exception to the hearsay rule applicable to the incriminatory statements of Gomez' co-defendants, namely the co-conspirator exception, *Bruton* does not apply.[15] That *Bruton* is inapposite is readily apparent when the alternative to a joint trial is considered. If the trial of Gomez had been severed from the trial of his two co-defendants on the basis of *Bruton*, the statements in question still would have been admissible against Gomez. *Grieco v. Meachum,* 533 F.2d 713, 716 (1st Cir. 1976), *cert. denied,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976); *United States v. Clayton,* 450 F.2d 16 (1st Cir. 1971), *cert. denied,* 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972).

## IV. *Standing to Challenge the "Ship Bottom" Search.*

■ The appellants next contend that their fourth amendment rights were violat-

ed by the admission of evidence obtained in the search of Chandler's room in the Drifting Sands Motel in Ship Bottom, New Jersey. After the indictment had been filed in this case, fourteen other defendants who were charged with related crimes filed motions to suppress certain evidence obtained in the Ship Bottom search and the search of Marianne Cook's house.[16] Although the trial court suppressed the contraband seized at the Drifting Sands Motel in New Jersey as to some defendants, the court denied appellants' motion to suppress on the ground that the appellants lacked standing to challenge the asserted illegality of both searches. Although the appellants were not on the premises of the New Jersey motel when the seizure was made, they urge two grounds upon which their standing is based. First, they contend that they had a possessory interest in the contraband at the time of the search. Second, they contend that they are entitled to "constructive standing" based on the self-contradiction of the prosecutor's position with respect to the evidence seized. In support of their first argument, the appellants note that the twenty-eight kilos of cocaine and several thousand pounds of marijuana were shipped to Cravero and Chandler around June 23, 1974. Since agent Short had testified that Gomez and Ramirez had not been paid by Cravero and Chandler for these drugs as of the end of July, 1974, the appellants contend that they still retained a proprietary interest in the drugs at the time that they were seized. They admit that some payment had been made by Cravero and Chandler to the defendants, but that the amount was insufficient to extinguish their proprietary interest.

The Government contends that the appellants had no reasonable expectation of privacy in room 201 of the Drifting Sands Motel in New Jersey. Relying on *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), the Government con-

---

15. *Bruton* was specifically limited to hearsay "clearly inadmissible against [the defendant] under traditional rules of evidence". 391 U.S. at 128 n.3, 88 S.Ct. at 1623.

16. The admissibility of the evidence seized at the Cook residence was established in *United States v. Cravero, supra* at 414–18, 420–21.

tends that the appellants lacked the requisite "dominion and control" over the cocaine. This court, in *United States v. Hunt*, 505 F.2d 931 (5th Cir. 1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975), further explicated the rule of standing as announced in *Brown*. The court noted that fourth amendment rights are personal and may not be asserted, for example, by one business partner with respect to a search of another partner solely on the basis of the partnership relation. The court held that:

> [c]o-defendants and co-conspirators may not assert the Fourth Amendment rights of their alleged partners in crime solely on the basis of their interpersonal association, because Fourth Amendment rights are personal ones. [citation omitted]. Since co-defendants and co-conspirators can often make out some semblance of a property right in the sorts of things that might be searched and seized from their cohorts, [*Alderman v. United States*, 394 U.S. 165, [89 S.Ct. 961, 22 L.Ed.2d 176] (1969)] demonstrates once again the primacy of privacy in the modern Fourth Amendment schema. (sic) *United States v. Hunt*, 505 F.2d 931, 939 (5th Cir. 1974).

The defendants in the *Hunt* case, like the appellants here, were not present at the time of the search in question. They attempted to show a possessory interest in the seized materials by alleging that they held legal title to them.

After finding that their claim was "a very tenuous one," the court stated as follows:

> [w]hatever title defendants may possess in disputed evidence, we cannot help but reflect that this discussion of . . . legal title has taken us very far from the substance of Fourth Amendment rights. As we have indicated above, the constitutional right of protection against unreasonable searches and seizures attaches only when an individual's reasonable expectation of privacy is shattered by illegal Government intrusion. Whatever minimal possessory interest defendants may have in the seized equipment, we

have been unable to discern the slightest privacy interest that defendants could reasonably assert in objects which they have never seen and of whose particular existence they were unaware until the disputed search and seizure. 505 F.2d 940–41.

Although the appellants, unlike the defendants in *Hunt*, had seen and were aware of the seized evidence, it is equally difficult to discern what privacy interest of the appellants was violated by the Government's search.

■ The appellants next contend that they are entitled to "constructive standing" based on prosecutorial self contradiction. This theory derives from *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), wherein the Supreme Court noted the difficulty encountered when a defendant is charged with a crime involving possession of evidence which the defendant alleges was illegally seized. In such a case, the defendant is required to allege possession in order to have the requisite standing to challenge the search. By admitting possession, however, the defendant has admitted an essential element of the crime which he is challenging in the case in chief. Although the appellants in this case were charged with conspiracy "to knowingly and intentionally import into the United States from a place outside thereof, and *to possess with intent to distribute*, divers quantities of cocaine," the Government contends that they were not charged with an offense which included as an essential element possession of the contraband at the time of the contested seizure. Following *Jones*, the Supreme Court in *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), held that, at least when prosecutorial self-contradiction is not a factor:

> there is no standing to contest a search and seizure where . . . the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense

charged, possession of the seized evidence at the time of the contested search and seizure. 411 U.S. at 229, 93 S.Ct. at 1569. Since the offense charged in this case does not include as an element of the crime possession of the seized item *at the time of seizure*, we believe that the question of "constructive standing" is foreclosed. Moreover, this case is controlled by yet another decision in which the Supreme Court held that a prosecutor may not use against a defendant at trial any testimony given by that defendant at a pretrial hearing to establish standing to move to suppress evidence. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). As noted in *Brown*, "*Simmons* has removed the danger of coerced self-incrimination. We simply see no reason to afford 'automatic' standing where as here, [there was no] risk to a defendant of either self-incrimination or prosecutorial self-contradiction." It is apparent, therefore, that the appellants were adequately protected by the safeguards announced in *Simmons*. Although they alleged a possessory interest for purposes of standing, their allegation of such possessory interest was not later used against them. They simply failed to demonstrate that the possessory interest in fact existed; as a result, they are not entitled to so-called constructive standing.

## V. *The Allegations of Prosecutorial Misconduct.*

The appellants argue that the prosecutors engaged in misconduct by eliciting various items of testimony which included references to the appellants' prior criminal activities and to Ramirez' status as a fugitive. Gomez alleges that this misconduct also involved continued references to the need for protection of government witnesses and concern for their safety. He also challenges the testimony of witness Miller about his earlier drug activities with co-conspirator Cravero before the alleged inception of the charged conspiracy. He objects similarly to Miller's references to his source of drugs in Colombia and his description of the source as being people and families who were very powerful and influential. He is attempting to show that the prosecutor inflamed the jury against the defendants by testimony as to the arrogance of the Colombians. Finally, he argues that the testimony of agent Short to the effect that there were "investigations on these people before" was prejudicial because it indicated prior narcotic investigations which were not then before the jury.

We will first consider the appellants' objections to certain statements made in the jury's presence concerning the safety of government witnesses. The Government contends that this line of questioning was required to show that payments made to the government informants were not made in return for testimony but were given to the witnesses to permit them to relocate in safety. The trial record shows that the district court sustained objections to many of the prosecutor's questions challenged here. Other allegedly prejudicial statements, however, were made in response to questions to which no objection was sustained.[17] The Government contends *inter*

---

17. A partial listing of both categories of challenged statements is set forth below:

Q. [Mr. Rose] After the Ranch House incident that you have testified to on July 14, 1974, you moved your family out of Florida; is that correct?
A. [Orr] Yes, Sir, I did.

\* \* \* \* \* \*

Q. [Mr. Rose] You were offered protection by the government? [objection sustained]

\* \* \* \* \* \*

Q. What is the Marshal Plan that you are talking about?

A. [Miller] It's a protective witness plan. [objection sustained]

\* \* \* \* \* \*

Q. What was the purpose of that (relocating William Orr)?
A. [Short] The purpose was because I thought he was in danger. [objection sustained]

\* \* \* \* \* \*

A. [Short] We couldn't have taken him to the jail, as we did other prisoners, because of the conditions of this arrest and the people we were dealing with.

\* \* \* \* \* \*

*alia* that all of these statements were harmless because the evidence on both the conspiracy and the substantive count overwhelmingly proved the guilt of the appellants.

■ The Government was properly permitted to explain the nature of payments made to Government witnesses. If unexplained, these payments might have left the jury with the impression that witnesses were being paid for testimony favorable to the prosecution. Particularly with respect to witness Orr, the fact and size of payments virtually cried out for an explanation. On cross-examination of Short, Miller and Orr, it was defense counsel who established that Orr and Miller received payments from the Government and that some of the payments were quite large. Absent an explanation of the Marshal's Protection Plan, under which payments were made to insure the safety and relocation of witnesses, defense counsel could have been expected to argue with persuasive effect that the prosecution had bought testimony from selfish and unsavory characters. Under these circumstances, we find no abuse of discretion in the district court's determination to allow proof that large payments were made, not for testimony, but for protection of witnesses.

■ Such testimony necessarily implied that protection was required because the appellants or their cohorts might seek revenge against the witnesses. Although the testimony to that extent was likely harmful to the appellants, the balancing of its probative value against prejudice was for the district judge, and his resolution was proper. We conclude that the prejudicial effect of the testimony in question was insufficient to justify a new trial. In order to require a new trial, the prejudicial effect of improper matter, viewed in the context of the particular trial, must not be overwhelmed, as it was in this case, by evidence of guilt. Rather, a significant possibility must exist that, considering the other evidence presented by both the prosecution

and defense, the statement had a substantial impact on the verdict of the jury. *United States v. Rojas,* 537 F.2d 216 (5th Cir. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

We next consider the allegation that the district court erroneously admitted evidence of prior misconduct on the part of the appellants. Since "bad man" testimony of this sort is highly prejudicial, this court has repeatedly warned of the danger inherent in its use. We have followed the rule that "the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character." *United States v. Johnson,* 453 F.2d 1195 (5th Cir. 1972); *United States v. Pittman,* 439 F.2d 906 (5th Cir. 1971); *Roe v. United States,* 316 F.2d 617 (5th Cir. 1963). Invoking this familiar principle, appellants are challenging certain testimony which may have incriminated them by revealing prior misconduct allegedly having no relevance to the case at bar.

■ Gomez and Ramirez object to certain testimony which refers to their prior criminal activities and to Ramirez' status as a fugitive. They both object to the following statement by Short: "I asked him [Ramirez] where he was wanted in the United States [and] [h]e told me he was wanted in Puerto Rico and in New York." They also object to the statement by Archbold contained in his tape recorded conversation with agent Short that "Alberto have (sic) practically the same problem as what Billy have (sic.)." The Government contends that these statements were intended to show why the meeting took place in Martinique and to show lack of mistake in arresting Ramirez. (Ramirez had contended throughout the Government's case that the agents were intending to arrest another person and instead mistakenly arrested him). The Government also alleges that

A. [Short] If (Andries) cooperated fully, we could get protection for his family. We told him we would give him protection and get him on the Marshal's program.

the evidence of Ramirez' prior activities was admissible to show the organization and structure of the conspiracy as well as the individual role played by each conspirator.

We find that there were substantially relevant reasons for admitting this evidence, other than to show a probability that Ramirez committed the offense because he is a man of criminal character. *United States v. Johnson*, 453 F.2d 1195 (5th Cir. 1972). The statement by Archbold indicated why the meetings with Short were held in Martinique rather than a United States territory. Since Andries had testified that he knew Ramirez as "Alberto Bravo," and since Ramirez used mistaken identity as a defense, the testimony of Short confirmed Ramirez' identity. Furthermore, Ramirez' statement that he was wanted in New York and Puerto Rico was made during negotiations with Short after Ramirez told Short to be careful with his name because he was wanted in the United States. Thus, it was relevant to explain the design of the conspiracy. The prejudice which might have resulted from the reference to Ramirez' fugitive status is simply one of the imperfections of a conspiracy trial. Given the purpose of the testimony and the relatively slight degree of possible prejudice, we conclude that the references were harmless when viewed in the context of the entire trial. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Rhoden*, 453 F.2d 598 (5th Cir. 1972) (per curiam).

Finally, this was not prior crimes evidence in the ordinary sense of evidence that is unrelated to the acts charged except by a legal inference. Ramirez' statements, necessary to conceal the proposed deal with agent Short, were themselves made in furtherance of a conspiracy covered by the indictment and unavoidably contained references to past misconduct. While it remains imperative to guard against prejudice posed by such evidence, the strictures applicable to admission of other crimes evidence *qua* other crimes evidence are not fully implicated.[18]

VI. *The Refusal of the Trial Judge to Disqualify Himself.*

The appellants filed a motion pursuant to 28 U.S.C. § 144, seeking to have Judge Fay disqualify himself because of allegedly biased and prejudiced remarks made at Ramirez' bond hearing. The affidavit of Ramirez was based upon four statements made by Judge Fay to the effect: (1) that he had already concluded, on the basis of three earlier trials involving the conspiracy charged in the indictment, that a conspiracy did in fact exist; (2) that he would "take those other trials into consideration;" (3) that he believed DEA agent Short to be a credible witness; (4) that he had concluded that there was an abundance of testimony in addition to Short's testimony that "these three individuals were members of a conspiracy that I can only describe as a large-scale conspiracy composed of the most vicious individuals that this court has ever seen."

The appellants contend that, once the affidavit setting forth these contentions is filed, the judge against whom it

---

**18.** With respect to agent Short's comment that there had been "investigations on these people before," we conclude that the comment was improper but that it was harmless in light of the overwhelming evidence of guilt. The comment was made at the very outset of agent Short's testimony in response to the question: "Have you been in charge of the investigation from the very beginning?" Short's response indicates that he was apparently attempting to explain that he had conducted the investigation leading to the trial of the defendants in the instant case, but that he had not been involved in previous investigations of the Cravero organization:

In this case, I have been. *There were investigations on these people before that,* but the organization that we heard testimony on, the Cravero organization, from April of 1974, I have been the case agent in charge of the investigation. (emphasis supplied).

Defense counsel did not object either to the question or the response, and the prosecutor thereafter continued his preliminary questioning of agent Short. Taken in context, therefore, the prejudicial impact of the statement was minimal. *Rhoden, supra.*

is filed is limited to a determination of three issues: (1) was the affidavit timely filed; (2) was it accompanied by the necessary certificate of counsel of record; and (3) is the affidavit sufficient in statutory terms? *Parrish v. Board of Commissioners of Alabama State Bar*, 524 F.2d 98, 100 (5th Cir. 1975) (en banc). The legal sufficiency of the affidavit is determined by ascertaining whether it contains facts which would "convince a reasonable man that a bias exists." It is clear, however, that the facts alleged in the affidavit must show that the judge's bias is personal, as opposed to judicial, in nature. *Curl v. IBM*, 517 F.2d 212 (5th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1975); *United States v. Thompson*, 483 F.2d 527 (3rd Cir. 1973).

■ The very language of section 144 is expressed in terms of "personal" bias, and for good reason. Ours is not a system of disposable judges wherein members of the judiciary may be discarded after a single use. Yet, appellants would have this court declare that Judge Fay was disqualified from further participation in the case merely on the basis of knowledge he acquired in previous proceedings in his court. Anomalous consequences would result if we were to adopt this tortured interpretation of section 144. For example, it might well become impossible for a judge to continue participating in a case if he grants a motion to suppress illegally obtained evidence. Under appellants view, such a judge would be disqualified by the knowledge, necessarily acquired to grant the requested ruling, that a defendant was caught red-handed with contraband property in his possession. We conclude that the remarks made by Judge Fay were not personal and that his bias, if any, was not extrajudicial.

Moreover, we note that Judge Fay made the allegedly prejudicial statements during his consideration of a motion for reduction of bail made pursuant to 18 U.S.C. § 3146(b). That statute requires the presiding judge to take into account "the nature and circumstances of the offense charged, *the weight of the evidence against the ac-*

*cused*, [and other factors]." (emphasis supplied). Judge Fay's comments in each instance were directed to the weight of the evidence against the appellants. He was stating for the record his reasons for concluding that the appellants should be held without bail. In doing so, he indicated no personal bias whatsoever; he merely summarized and explained the reasons for his decision concerning bail. That decision was based solely on information acquired, and conclusions reached, during the performance of his judicial duties.

## VII. *The Authority of Special Strike Force Attorneys.*

■ Appellant Gomez argues that the Attorney General of the United States was without authority to delegate to special Strike Force attorneys the responsibility of conducting this criminal litigation. This contention is based on two arguments: (1) that the Attorney General cannot delegate to subordinate Department of Justice officials his authority to appoint and direct special attorneys; and (2) that the Attorney General is without authority to create Regional Strike Forces. This court has previously concluded that the first of these arguments is without merit. *United States v. Cravero*, 545 F.2d 406 (5th Cir. 1976), *cert. denied*, —— U.S. ——, 97 S.Ct. 1679, 52 L.Ed.2d 377 (April 26, 1977); *United States v. Morris*, 532 F.2d 436, 439–40 (5th Cir. 1976). We find no reason to abandon our previous conclusions with respect to this contention.

■ Appellant Gomez' second contention—that the Attorney General cannot designate Regional Strike Forces—is foreclosed by the language of 28 U.S.C. § 515(a) which provides as follows:

(a) The Attorney General or any other officer of the Department of Justice, or any attorney *specially appointed by the Attorney General* under law, may, when *specifically directed by the Attorney General*, conduct any kind of legal proceeding, civil or criminal, *including grand jury proceedings and proceedings before committing magistrates, which United States*

*attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.* (emphasis added).

The section imposes no geographical limitations on the Attorney General's authority to organize specially appointed attorneys who are appointed and directed to conduct proceedings pursuant to the statutory provision. Moreover, appellant Gomez has cited no authority which supports his contention. *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), construing the specific limitations on the Attorney General's authority to delegate authority under 18 U.S.C. § 2516(1), has no bearing on the contention here presented.

We therefore conclude that the argument is without merit.

## VIII. *The Denial of Appellants' Motion for Disclosure of the Martinique Extradition Proceedings.*

Prior to trial, appellants Ramirez and Gomez moved the district court for disclosure of the extradition proceedings relating to their extradition from Martinique to the United States. The motion was denied. Appellants contend that the district court's ruling was erroneous, and that this action must be remanded for further proceedings. In support of their contentions, appellants rely on the Extradition Treaty of 1909 between the United States and France.[19] Article VIII of that Treaty provides in pertinent part as follows:

Extradition shall not be granted, in pursuance of the provisions of this convention, if the person claimed has been tried for the same act in the country to which the requisition is addressed.

On February 12, 1970, when France signed a supplementary convention to the Extradition Treaty of 1909, the United States and France entered into an extradition treaty specifically encompassing narcotics smuggling. Article IV of that supplementary convention provides that extradition shall not be granted:

1. When the person whose surrender is sought is being proceeded against or has been tried and discharged or punished in the territory of the requested party *for the acts for which his extradition is requested.* (emphasis supplied)

Although not articulated separately, appellant's arguments seem to polarize into two distinct contentions, both of which are intended to justify discovery of the extradition proceedings and papers. First, they argue, although somewhat obliquely, that the indictment in the instant case is based on acts for which they were prosecuted in Martinique. Second, they condemn the Government's use of evidence obtained in Martinique to the extent that the same evidence might have been used by the French government in its prosecution of the appellants.[20] With regard to appellants' first line of attack, Count II of the indictment could not possibly offend the "same act" prohibition of the Treaty, since the acts alleged in that Count occurred in June, 1974, which was five months before the appellants arrived on Martinique. With respect to the conspiracy charged in Count I, the only activities in which both France and the United States might have an interest, in terms of criminal prosecution, are the statements made and acts done by the appellants while they were on Martinique. Counsel for the Government, however, unequivocally stated before the trial court that the appellants were not being tried for any acts which took place on Martinique:

First of all, it is, of course, our position that these defendants are not on trial for any acts which took place in Martinique but rather we intend to offer those statements and those transactions as being evidence of the conspiracy that they are charged with today.

**19.** United States Treaties and Other International Agreements, 22 U.S.T. 408, 409 (1970).

**20.** In his brief, appellant Gomez complains that [t]he government offered as part of its evidence below these same conversations of Defendant Gomez with agent Short while in Martinique on November 17 and 18, 1974 in order to obtain the Defendants' conviction of conspiracy to import drugs (Count I) and in importing drugs into the United States. (Count II).

This statement is accurate only in one sense of the word "act." The conspiracy count of the indictment charged the appellants with twenty-nine overt acts, of which one was the meeting in Martinique. Therefore, the conspiracy count was, to a minimal extent, based upon an act which took place in Martinique. Thus, if appellants were prosecuted in Martinique for a crime based upon the meeting—which fact we are unable to assume since appellants have not informed the court of the precise nature of the offenses charged by the French Government—the question arises as to whether or not the entire conspiracy count is a prosecution for the "same acts" as those committed on Martinique. Assuming *arguendo* that the appellants were prosecuted for a crime based on the act of meeting in Martinique, we conclude that a conspiracy count alleging twenty-nine overt acts, of which the meeting is one, is not a prosecution within the coverage of the "same act" provision of the Extradition Treaty.

The appellants have astutely observed that the meeting has a dual character. The meeting itself was one of the conspiracy's many overt acts, but the negotiations which occurred during the meeting may have incidentally violated French law. We conclude, however, that the latter characteristic of the meeting did not preclude the Government from alleging as an overt act in furtherance of the conspiracy the *fact* of the meeting, for its occurrence alone is the significant element vis-a-vis this case.

An overt act is the manifestation of an otherwise theoretical conspiracy. In *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1956), the Supreme Court stated that:

> [i]t is not necessary that an overt act be the substantive crime charged in the indictment as the object of the conspiracy. *Pierce v. United States,* 252 U.S. 239, 244, [40 S.Ct. 205, 207, 64 L.Ed. 542]; *United States v. Rabinowich,* 238 U.S. 78, 86, [35 S.Ct. 682, 59 L.Ed. 1211]. Nor indeed, need such an act, taken by itself, even be criminal in character. *Braverman v.*

*United States,* 317 U.S. 49, [63 S.Ct. 99, 87 L.Ed. 23]. The function of the overt act in a conspiracy prosecution is simply to manifest "that the conspiracy is at work," *Carlson v. United States,* 187 F.2d 366, 370, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence. 354 U.S. at 334, 77 S.Ct. at 1084–1085.

The possibility that one of the overt acts alleged in the conspiracy count was or was not, incidentally violative of French law is of no real moment.

█ A prosecution for conspiracy is not the equivalent of a prosecution for having done or performed the overt act, for an overt act may not, itself, be unlawful at all. *Yates, supra.* Thus where the overt act is as innocent as the act of a man walking across the street, *see generally Yates, supra; Castro v. United States,* 296 F.2d 540 (5th Cir. 1961), a defendant is subject to no prosecution for it, standing alone. It follows that immunity from prosecution for a crime incidentally committed against a local law while performing an overt act pursuant to a conspiracy does not confer immunity to the conspiracy charge nor the naming and proving of the act as an "overt act." Were this not so, the successful prosecution of a defendant for jay-walking while crossing the street in pursuit of the object of a conspiracy would end the conspiracy charge. Were the prosecution here *for* the actions done in Martinique, we should be concerned with discovering whether or not the French Courts had prosecuted for the same crime. The prosecution here under investigation was for conspiracy, and the meeting in Martinique could properly be shown as an overt act pursuant thereto whether it was, itself, lawful or criminal under some law of that jurisdiction.

█ In their second avenue of attack, appellants challenge the use of evidence obtained in Martinique to prove the conspiracy charged in Count I. This contention is also without merit. None of the provisions of the Extradition Treaty relied on by the appellants permit the asylum state (France)

to delimit the nature of the evidentiary rules to be followed in the requisitioning state (United States). Article VII of the Treaty provides in pertinent part as follows:

> No person surrendered by either of the high contracting parties to the other shall be triable or tried or be punished for any crime or offense committed prior to his extradition, other than the offense for which he was delivered up . . . .

This article, which embodies the essence of the international law doctrine of specialty, does not strengthen appellants' argument.[21] Neither the principle of specialty nor the manifestation of it in Article VII lend support to appellants' contention that the evidence obtained in Martinique is inadmissible to prove the alleged conspiracy. A similar contention was rejected by the Second Circuit in *United States v. Flores*, 538 F.2d 939 (2d Cir. 1976), where the court stated as follows:

> It is clear, however, that even as the specialty doctrine has been defined and broadened in this century, it has never been construed to permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state, as distinguished from limiting the jurisdiction of domestic courts to "try or punish the fugitive for any crimes committed before the extradition, except the crimes for which he was extradited." Friedmann, Lissitzyn & Pugh; International Law 493

(1969). Where, as here, a defendant is indicted and tried for the precise offense contained in the foreign extradition order . . . ., the doctrine does not authorize us to disregard normal evidentiary rules followed by this forum. 538 F.2d at 944. We find, therefore, that the admission of evidence obtained on Martinique was permissible and that the district court properly denied appellants' motion for discovery.

### IX. *Conclusion.*

We have examined appellants' remaining contentions and, finding them to be without merit, we affirm the judgment of the district court.[22]

---

**21.** In *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir. 1973), the court defined the principle of specialty and its operation when the United States is a party to the treaty in question:

> The "principle of specialty," long recognized in international law, provides that "the requisitioning state may not, without the permission of the asylum state, try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited." Friedmann, Lissitzyn & Pugh, International Law 493 (1969); see generally 1 Moore, Extradition 194–259 (1891). In *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886) the Supreme Court established the rule of domestic law that the courts of this country will not try a defendant extradited from another country on the basis of a treaty obligation for a crime

not listed in the treaty. While this determination might appear to be limited to circumstances indicating a possible evasion of the treaty, the principle has been extended to bar prosecution for crimes listed in the treaty but for which extradition, for whatever reason, was not granted. See *Johnson v. Browne*, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907); *Greene v. United States*, 154 F. 401, 407–408 (5 Cir. 1907); see generally 1 Moore, supra, at 245–256. 478 F.2d at 905.

**22.** We reject appellants' contention that the imposition of consecutive sentences on the conspiracy and the substantive counts somehow offends the double jeopardy provision of the fifth amendment. *Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).