**UNITED STATES of America,
Plaintiff-Appellee,**

*v.*

**Jose A. GONZALEZ,
Defendant-Appellant.**

**No. 82–5366.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 21, 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1312.

**1518**

Jose J. Larraz, Jr. (Court appointed), Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Miami, Fla., Michael Hursey, West Palm Beach, Fla., Linda Collins Hertz, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before FAY and KRAVITCH, Circuit Judges, and ATKINS *, District Judge.

ATKINS, District Judge:

Jose A. Gonzalez and Gilbert D. Morales were charged in a three-count superseding indictment with illegal possession of an automatic weapon, illegal transfer of an automatic weapon and conspiracy to possess and unlawfully to transfer a firearm. Morales plead guilty to Count III of the indictment. Gonzalez was convicted of all three counts. He raises issues dealing with double jeopardy, extra-judicial statements of Morales, and the sufficiency of the evidence. Finding no error in the trial proceedings and that the evidence supports the convictions, we affirm.

### Double Jeopardy

On January 14, 1982, the first jury trial of Gonzalez began. The following day, during cross examination of Special Agent Hudson, the last government witness, the following colloquy occurred:

Q. Now, after you arrested Mr. Gonzalez, did you have an opportunity to search the Federal Government's criminal records banks to find out whether Mr. Gonzalez had a criminal record?

A. Yes, sir.

Q. And what did you find, Agent Hudson?

A. I found an FBI print-out indicating a previous arrest of cocaine, and marijuana in Dade County.

Q. And what, if any, was the end of that arrest?

A. The last word I got two days ago was on the phone that the file reflected no information. That was an ambiguous term, as well as you know. An information is like an indictment. I could not find out from the young lady who helped me whether they was telling me that no information had been filed, or whether it meant in the dictionary, no information. I don't know what the disposition of the case was. I was unable to learn. I got the impression he was not convicted of that.

Q. Didn't you also get the impression you don't know whether that is this Jose Gonzalez or not?

A. Yes, it is the same.

Q. It is the same?

A. Yes. It is based on the fingerprints I personally took of him, and sent to Washington, and compared by the Federal Bureau of Investigation with prints on file for 1980.

(T 191–92)

Defense counsel then requested a side bar conference and moved for a mistrial because the government had not previously told him about his client's prior arrest. The government argued, *inter alia,* that when defense counsel asks a question on cross-examination that goes beyond the limits of relevance as set forth in the Federal Rules of Evidence,[1] he does so at his own peril. The Court also expressed its curiosity as to why defense counsel had asked this series of questions. (TR 193) The trial court re-

---

\* Honorable C. Clyde Atkins, U.S. District Court Judge for the Southern District of Florida, sitting by designation.

1. *Fed.R.Evid.* 609(a) permits use of a *conviction* to attack credibility during cross examination of a witness (emphasis supplied).

cessed for the day shortly thereafter. (T 124–25)

The next morning, the government admitted that it had not physically handed defense counsel a copy of defendant Gonzalez' F.B.I. "rap sheet" which had arrived over two weeks earlier (TR 200, 201). Defense counsel, however, had been put on notice of such an arrest in an informal conversation with Agent Hudson several days before the trial. (T 200–03) When specifically asked by the Court whether his client had revealed his prior arrest during pre-trial interviews, defense counsel asserted the attorney-client privilege. (T 198)

The Court gave defense counsel the choice of two solutions (a) declare a mistrial or (b) "go ahead" with the current jury and give them a "[strong] instruction" directing that a "prior arrest is not to be considered in any way in determining guilt or innocence." Defense counsel announced that he opted for a mistrial.

The second trial commenced on January 19, 1983. Before the jury was sworn, defendant moved for a mistrial on double jeopardy grounds. The motion was denied.

Gonzalez concedes in his brief that "if a defendant moves for a mistrial to a large extent he cannot thereafter be heard to complain of a retrial." (page 18). He urges, however, the narrow exception articulated in *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982):

> Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion (*Id.* at 676, 102 S.Ct. at 2089).

Gonzalez contends that the non-disclosure of the "arrest evidence" was "a deliberate prosecutorial stratagem to abort the trial" (Appellant's brief, page 18) and reprosecution should have been barred. Evidence of prior arrests, during the government's case in chief, was clearly inadmissible as irrelevant and prejudicial. Only certain convictions under certain conditions are admissible for impeachment under Rule 609 of the Federal Rules of Evidence.

The government had a clear duty under the Standard Discovery Order and its assurances in the discovery letter of October 29, 1981 to supply the FBI arrest record promptly upon its receipt. They simply failed to do so. Such conduct should not be condoned. The United States Attorney should take effective remedial steps to avoid such inexcusable lapses.

It is another matter, however, to urge that such conduct, occurring prior to the selection of the jury in the first trial, was intentionally designed to abort the trial before that jury. There was no indication that the trial was going poorly for the government; the prosecutor therefore had no reason to prompt a mistrial. Moreover, the government gained no advantage by the mistrial since the evidence adduced at the second trial was the same as that used in the first trial. *See Arizona v. Washington,* 434 U.S. 497, 508, 98 S.Ct. 824, 831, 54 L.Ed.2d 717 (1978); *United States v. Opager,* 616 F.2d 231, 234 (5th Cir.1980); *United States v. Kessler,* 530 F.2d 1246, 1255 (5th Cir.1976).

■ The negligent government action occurring here, which we criticize, does not reach the level of contumacious conduct necessary for a finding of prosecutorial overreaching. *Compare United States v. Kessler,* 530 F.2d 1246 (5th Cir.1976) *with United States v. Broderick,* 425 F.Supp. 93 (S.D.Fla.1977). *But cf. United States v. Garza,* 603 F.2d 578 (5th Cir.1979). We therefore find the appellant's double jeopardy argument to be without merit.

### The Facts

During the course of a federal government investigation, Special Agent Rudy Pena, of the Bureau of Alcohol, Tobacco and Firearms (ATF), acting in an undercover capacity, was introduced by Alvaro Kim, an ATF informant, to Gilbert David Morales. (TR 85–86) After a series of meetings and conversations over the next two days, about the availability and price of machineguns and silencers, Morales introduced Kim to "a friend of mine namely, Jose." (TR 114) At trial, Kim testified

that the man introduced to him by Morales as Jose seemed to be the defendant Gonzalez, but he was not sure. (TR 117) When Jose left the Morales residence that night, Kim saw him get into a late-model car like a Grand Prix or Chevrolet. (TR 115) There was a second person on the passenger side, and one in the back. (TR 115–16) Just after the man named Jose left, Morales told Kim that Jose was the person who would get what Agent Pena was looking for—the fully automatic weapon. (TR 117, 130)

At about 2:20 a.m. on September 18, 1981, Agent O'Dea looked through a periscope and observed a 1981 cream colored Buick drive into the Morales driveway and stop. (TR 136) Defendant Gonzalez got out of the automobile, looked to his right, looked to his left and reached into the vehicle to get a valise, or carrying case. (TR 137, 147) During the walk from the car to the residence, Defendant Gonzalez walked quickly and purposefully, the briefcase not moving much from his side and with his elbows in a locked position. (TR 137, 140–41) Agent O'Dea testified that Government Exhibit 4 was very similar to the type of tan briefcase that Defendant Gonzalez had carried into the house; Exhibit 4 had been found in the passenger seat of the vehicle at the time of the arrest of Defendant Gonzalez. (TR 138)

Agent Pena immediately placed a telephone call from the Howard Johnson's to Morales' residence at about 2:31 a.m. Morales answered the telephone; Pena told him that he wanted to find out about the transaction. Morales stated, "What a coincidence! I have just been delivered my weapon—'my lady.'" (TR 94) Agent Pena asked Morales to be more specific, and Morales replied, "I have what you want." Agent Pena asked if it was automatic, and Morales responded: "It is fully automatic." (TR 94) Agent Pena asked Morales about the quantity and stated that they had been talking about ten or fourteen weapons, but Morales was only talking about one. Morales said he could not discuss it on the telephone and stated, "I have to get rid of my people." (TR 94)

Agent O'Dea observed Defendant Gonzalez come out of the house, stop, and wave toward the house, with the briefcase moving about in a swinging motion. Defendant Gonzalez then got back inside the car. Agent O'Dea positively identified Defendant Gonzalez as the man he saw leave the car and go into the house. (TR 138)

After leaving the Morales residence, the three men in the car travelled slowly on the highway while they were being followed by Agent Hudson and the other agents. (TR 175–176) The three occupants of the car, including Defendant Gonzalez, were arrested shortly thereafter. (TR 155–6) In the meantime, Morales had delivered the machinegun to Agent Pena at the Howard Johnson's and was also arrested. (TR 95–96)

Pursuant to the arrest of the individuals in the car, Agent Hudson conducted a search of the interior of the car. He found a tan briefcase (Government Exhibit 4), a tan plastic gun guard case (Government Exhibit 3) and Defendant Gonzalez' hand purse and its contents (Government Exhibits 5A and 5B) (TR 156–57), all of which were admitted into evidence. (TR 170)

### The Defendant's Case

Defendant Gonzalez testified that he and his two companions had gone to the Morales residence at about 8:00 p.m. on the evening in question to get cassette tapes that had been promised to Defendant Gonzalez by Morales four or five days previously. (TR 259–60) Morales told Gonzalez that he did not have the tapes at that time and that Gonzalez should return later to allow time for the tapes to be brought in. (TR 261–62) The defendant admitted seeing Kim at the house on that visit, but denied talking to him. (TR 263)

### Admission of Co-Conspirator's Statements

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not excludable as hearsay if offered against a party and made "by a co-conspirator of a party during the course and in furtherance of the conspiracy." Before admitting such statements, however, an initial determina-

tion must be made by the trial judge that there is "substantial independent evidence of a conspiracy ...." *United States v. James,* 590 F.2d 575, 581 (5th Cir.1979).

The indictment was based upon transactions between Morales, Agent Pena and informant Kim. Gonzalez urged that the trial court erred in admitting into evidence certain statements made by co-conspirator Morales to Agent Pena and informant Kim, which statements, the Court held, were made in the course of and in furtherance of the conspiracy. In support of that argument, Gonzalez contends that the necessary evidentiary predicate, showing a conspiracy existed independent of those statements, was not established by a preponderance of the evidence and that the statements therefore should not have been admitted for consideration by the jury.

The trial court found, at the close of the government's case, that the requirements of *James* had been met. A pretrial *James* hearing is not mandated. *United States v. Miller,* 664 F.2d 826 (11th Cir.1981). *See also United States v. Ocanas,* 628 F.2d 353, 359–60 (5th Cir.1980), *cert. denied* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981); *United States v. Grassi,* 616 F.2d 1295, 1300 (5th Cir.1980), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). The independent evidence considered by the Court disclosed that (a) Gonzalez possessed a personal telephone directory containing the names "Gilberto Morales" (a co-conspirator) and "Elliott Navarro" (the source for silencers); (b) Gonzalez met twice with Morales during a crucial six-hour period directly preceding and including the time of the delivery of the machinegun; (c) when Gonzalez was arrested, he possessed a gun guard case, specifically designed to hold firearms, which contained 20 live rounds of the exact caliber bullet of the gun that was ultimately delivered by Morales to Agent Pena twenty minutes after the defendant had left Morales' residence; (d) at 2:23 a.m. at the Morales residence, Gonzalez was seen leaving a car, looking to the left and then to the right, walking in a purposeful manner with a briefcase which appeared heavier when he entered the house than when he walked out a short while later.

The District Court's assessment of the *James* issue is a finding of fact which will be overturned only if it is clearly erroneous. *United States v. Roper,* 681 F.2d 1354, 1359–60 (11th Cir.1982). The finding by the Court that there was substantial independent evidence of a conspiracy is clearly supported by the record. We therefore find that Gonzalez' contention is without merit. The trial Court properly admitted the statements of the co-conspirator.

### The Sufficiency of the Evidence

Gonzalez challenges the sufficiency of the evidence to support his conviction. The government responds that there never was any dispute that the defendant had not made an application either to possess or transfer an automatic weapon under the mandate of the National Firearms Act. Gonzalez' main argument is that the evidence failed to establish he possessed the MAC–10 machinegun or conspired to do so. This Court must determine whether, viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), a reasonable trier of fact could find guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc). The test is identical whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Warner,* 441 F.2d 821 (5th Cir.1971), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971).

Finally, we must decide whether there was substantial evidence to support the verdict. In so doing we accept all reasonable inference and credibility choices made by the fact-finder. *United States v. Marx,* 635 F.2d 436, 438 (5th Cir.1981). *United States v. Alfrey,* 620 F.2d 551 (5th Cir.1980); *United States v. Malatesta,* 590 F.2d 1379 (5th Cir.1979) (en banc), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

Title 26 U.S.C. §§ 5861(d) and (e) provide as follows:

It shall be unlawful for any person

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record

(e) to transfer a firearm in violation of the provisions of this chapter

■ There are two essential elements that the government had to prove beyond a reasonable doubt to sustain the conviction of Gonzalez under Section 5861(d): (1) that the defendant, at or about the time and place charged in the indictment, knowingly possessed an automatic weapon, and (2) that the automatic weapon was not then registered to Gonzalez in the National Firearms Register and Transfer Record.

The government must similarly prove two elements to sustain a conviction under Section 5861(e): (1) that Gonzalez, at or about the time and place charged in the indictment, knowingly transferred an automatic weapon, and (2) that the automatic weapon was not then registered to the defendant in the National Firearms Register and Transfer Record. The term "firearm" includes any automatic weapon. 26 U.S.C. § 5845.

■ Further, the government does *not* have to prove that the defendant knew that the weapon in his possession was a "firearm" within the meaning of the statute, or that he knew registration was required. It is a violation of federal law for Defendant Gonzalez to merely possess such a weapon not registered to him. There is no scienter required to be proven. *United States v. Cheramie,* 520 F.2d 325, 329 (5th Cir.1975). Mere possession is a violation of the statute.

■ Morales twice stated to Kim that Gonzalez was his source for the machineguns. Morales' obvious dependence on his source for the delivery of the machinegun, when coupled with the non-hearsay evidence, created a question of fact for the jury to decide. The jury, which has the responsibility for making credibility determinations, obviously believed Morales and rejected the "innocent explanation" of the events put forward by Gonzalez. Applying

the *James* requirement and the teaching of *Roper* to the facts here, we conclude that the evidence was sufficient to convict Gonzalez.

The conviction is AFFIRMED as to all counts.