**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jose Jader ALVAREZ–MORENO, a/k/a
Carlos Jader Alvarez, Said Pavon Jatter, Ricardo Pavon Jatter, Defendants–
Appellants.**

**No. 86–5517.**

United States Court of Appeals,
Eleventh Circuit.

June 7, 1989.

Robert F. Dunlap, Miami, Fla., for Said & Ricardo Pabon.

Myles H. Malman, Susan Tarbe, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

G. Richard Strafer, Coral Gables, Fla., for Alvarez–Moreno.

Before HATCHETT and CLARK, Circuit Judges, and FITZPATRICK *, District Judge.

HATCHETT, Circuit Judge.

In this massive drug importation, drug distribution, and money laundering case, we determine the extent to which uncharged criminal offenses may be used as predicate offenses for continuing criminal enterprise prosecutions (21 U.S.C. § 848). We affirm the convictions, but remand for resentencing of one appellant.

### FACTS

In 1981, the Drug Enforcement Administration (DEA) initiated "Operation Swordfish" to identify and apprehend individuals "laundering" the proceeds derived from the sale of illegal narcotics. To facilitate this effort, the DEA established a corporation known as Dean International Investments (Dean Investments).

Frank Chellino, a DEA agent, assumed the undercover identity of Frank Dean, president of Dean Investments. Generally, Dean Investments offered services such as: changing cash from small denominations to large denominations, providing corporate and cashier's checks, transferring money to foreign bank accounts, and exchanging United States' currency for Colombian pesos. To provide these services, Dean In-

* Honorable Duross Fitzpatrick, U.S. District Judge for the Middle District of Georgia, sitting by designation.

vestments opened corporate accounts at various banks, conducted transactions under its corporate name, and served as an agent between its clients and authorities monitoring the banks. Dean Investments provided services to customers only through referral, was unavailable to the general public, and charged commissions for its services.

Two confidential informants, Roberto Darias and Felipe Calderon, worked with Dean Investments to recruit individuals who wished to launder money. Using contacts in the Miami area, Darias and Calderon established that Dean Investments would provide services to individuals who wanted to avoid customary banking and financial channels.

On July 6, 1981, Chellino (posing as Frank Dean) and Darias met Manuel Sanchez, an assistant vice-president at the Bank of Miami. At this meeting, Chellino and Darias informed Sanchez of the services that Dean Investments could provide, and that they were seeking banks in which to deposit cash for customers. Stating that his bank had restrictions upon accepting new cash customers, Sanchez referred Chellino and Darias to two banks that accepted large amounts of cash for a fee. Sanchez then advised Chellino and Darias that he would contact them later.

On July 15, 1981, Sanchez referred Lionel Paytubi to Dean Investments. Paytubi told Dean Investments representatives that he knew several individuals interested in utilizing its services, in particular, a woman who wanted to exchange a million dollars a week from small bills to large bills. Paytubi later advised Chellino that the woman's name was Marlene Navarro.

## Marlene Navarro

In a later meeting with Chellino, Paytubi affirmed his claim that Navarro would provide a million dollars a week to be transferred to Panama. On August 5, 1981, Marlene Navarro met Darias and advised him that she handled $80 million a year for her boss, that some of the money originated in California, and that some of the money originated in Miami.

In the first transaction, Navarro delivered $500,000 in cash to Dean Investments and requested that the money be wire-transferred to Panama, agreeing to a 5½ percent commission.

On August 14, 1981, after receiving a message from Paytubi, Darias proceeded to the parking lot of Navarro's lawyer, Lester Rogers. At the parking lot, Navarro removed a locked suitcase from her vehicle and handed it to Darias. At the Dean Investments office, its representatives found $484,700 in the suitcase. Pursuant to Navarro's instructions, Dean Investments transferred the money to a numbered account at a bank in Panama. On August 20, 1981, Darias delivered the wire transfer receipts to Navarro's lawyer's office. At the office, Rogers advised Darias that the funds originated from "chemical plants" in Colombia, and that its owner handled $400 to $500 million a year.

Following this successful transfer, daily communications developed between Navarro and Darias. Shortly after the meeting at Rogers's office, Darias met with Navarro at a restaurant in Miami where she explained that her business came from Colombia and described her constituency as "powder people." After the initial money transfer, Darias kept in close contact with Navarro and successfully completed several transactions involving large sums of money. The government presented evidence of twenty to twenty-one transactions.

On September 14, 1981, Navarro informed Darias that her boss in Bogota, Colombia, was using a pilot in Tampa, Florida, to fly money to Colombia. Concerned with possible detection from authorities, Navarro tried to convince her boss that it was prudent to use the Dean Investments organization to wire transfer the money to Panama.

On October 6, 1981, Navarro informed Darias that her boss's children had been kidnapped in Colombia, and that the kidnappers were demanding a large ransom. After traveling to Colombia, Navarro returned to Miami to arrange another transfer of money. Navarro contacted Darias

and requested that the Dean Investments organization exchange $400,000 in small denomination bills to large denomination bills. On November 6, 1981, Darias met Navarro in a parking lot in Miami where she gave him a bag containing $285,700; Dean exchanged the money into $100 bills and returned the proceeds to Navarro.

As the Navarro and Darias relationship matured, Navarro introduced Darias to other members of the organization. In December of 1981, Darias met Luis Rodriguez. Navarro explained that Rodriguez received money from merchandise distributed in California. To obtain a $250,000 certificate of deposit for Rodriguez, Navarro gave Darias $240,000; she delivered the remaining $10,000 later. After Darias delivered the receipt for the certificate of deposit, Navarro informed Darias that her boss's name was Alvarez or Carlos Moreno and that he could not travel to the United States because of his fugitive status resulting from seizure of his airplane containing money at the Opa–Locka, Florida Airport.

In January, 1982, Carlos Alvarado, another associate of Navarro and Alvarez–Moreno, met with Darias. Alvarado stated that he transported cash to Colombia for Alvarez–Moreno. Thereafter, he offered Darias 100 kilograms of cocaine.[1] In March, 1982, Navarro advised Darias that Alvarez–Moreno approved of Dean providing money transfer services to Colombia. Consequently, a series of cash deliveries from Navarro to Dean Investments began. On April 2, 1982, Dean Investments received $100,000; on April 7, 1982, $160,000 and $52,000; on April 17, 1982, $85,000; and Navarro delivered $1,000,000 on the final April, 1982, delivery.

In May, 1982, Darias accompanied Navarro to the office of David Jaffee, a lawyer, who gave them $300,000. A week later, Navarro gave Darias $293,000 in a shopping bag.

In June, 1982, Darias met Oscar Garcia and Ricardo Jatter. Navarro informed Darias that Ricardo Jatter distributed cocaine in California for Alvarez–Moreno and that Garcia supervised cocaine distribution into the United States for Alvarez–Moreno. Navarro also informed Darias that a 100 kilogram surplus of cocaine existed from the last shipment, and that if Darias could secure a client for the cocaine, Ricardo Jatter and Garcia would be able to deliver it at any time. A few weeks later, Garcia offered Darias 170 kilograms of cocaine. Darias refused this offer and Navarro's offer of monthly deliveries of cocaine.

On July 1, 1982, Navarro informed Darias that Garcia had received 600 kilograms of cocaine on June 30, 1982, and offered Darias 100 kilograms. At this point, Navarro stated that Luis Rodriguez was in Peru processing cocaine for Alvarez–Moreno and that the processed cocaine would be delivered on a consignment basis. Several discussions occurred aimed at getting Darias involved in the distribution of illegal drugs in the United States. Later, at the Miami International Airport, Garcia advised Darias that 2,000 kilograms of cocaine would be delivered in the United States and transferred to Miami in 8 to 10 days and promised Darias 600 kilograms from the shipment. Garcia then offered Darias 150 kilograms of cocaine from the trunk of his automobile, but Darias rejected the offer stating that he required 600 kilograms.[2]

After the airport incident, Carlos Alvarado delivered $100,000 in small denomination bills to Dean Investments exchanging them for large denomination bills. DEA agents

---

1. Several of the financial transactions that occurred at the Dean Investments offices were videotaped. The DEA placed a call registering device on Navarro's home telephone and conducted a Title III wiretap from July, 1982 through September, 1982.

2. In a July 27th conversation between Navarro in Miami and Alvarez–Moreno in Colombia, the DEA recorded conversations discussing the need for "shares" and "spare parts" with the conversation noting the advantages of the Miami market. At trial, the jury heard some 300 telephone conversations between Navarro, Alvarez–Moreno, and others—including Said Jatter and Ricardo Jatter. These tapes were introduced as evidence, the product of an authorized wiretap on Navarro's telephone. Alvarez–Moreno admitted that he was the speaker in the taped conversations.

videotaped Alvarado stuffing the exchanged $100,000 into his trousers and socks.

On August 4, 1982, Navarro delivered $497,000 to Darias for Dean Investments to wire transfer to Panama. She showed Darias an additional $500,000 in shopping bags in a closet of her house. Meeting later at Miami Beach, Navarro asked Darias to accompany her to Denver, Colorado, to collect $1.5 million. During this meeting, Navarro gave Darias a shopping bag containing $50,000 taken from the trunk of her automobile, with instructions for Dean Investments to wire transfer the money to Panama.

### Denver Trip

On August 14, 1982, Navarro and Darias traveled by airplane to Denver, Colorado, to collect money. Upon arriveal, Said Jatter informed them that he did not have the money, but that he expected to have it shortly. Jatter also informed Navarro that he received a monthly allotment of only 150 kilograms of cocaine, and that his monthly requirements had increased. Said Jatter soon thereafter gave Navarro what she believed was $800,000. Expecting at least a million dollars, Navarro became upset over the shortage. In fact, when counted, Said Jatter had only given Navarro $679,216. After discussing the money shortage with Alvarez–Moreno and with Darias, Navarro stated that Alvarez–Moreno did not hold her or the Dean Investments representatives responsible for the shortage.

On August 27, 1982, Navarro delivered to Darias two shopping bags containing a total of $735,000. Her instructions were that $500,000 be exchanged for large denomination bills and delivered to Bertha Paez.[3] After Dean officials exchanged the funds, Navarro and Paez collected $497,000 at the Dean offices.

On September 7, 1982, Navarro met Darias for their last transaction. Alvarez–Moreno had given Navarro approval to deliver 150 kilograms of cocaine to Darias on September 15. At this meeting, Darias gave Navarro $134,000 in cash, representing the balance of the money that Dean Investments held for her.[4]

## EVIDENCE OF OTHER VIOLATIONS

### 1. Colombian Arrest

In January of 1982, the Colombian government arrested Alvarez–Moreno in Bogota, Colombia. Law enforcement officials found three bags of cocaine and Navarro's business card. Charges resulting from the arrest and search were dismissed.

### 2. The Opa Locka and Northern Trust Bank Incidents

On November 18, 1980, United States Customs Service agents were observing a small private aircraft registered to the country of Colombia. On November 21, 1980, two men drove an automobile to the airplane, removed suitcases and bags from the automobile, and placed them in the airplane. In the early morning hours of November 23rd, Alvarez–Moreno arrived at the airport with three other men. After Alvarez–Moreno left the airport, customs agents prevented the aircraft's departure and arrested three men in the airport lounge. In the aircraft, the agents seized a green duffel bag and five shoe boxes containing $1.6 million in cash. The pilot had an additional $64,000 in his suitcase.

On November 20, 1980, Alvarez–Moreno opened a checking account at the Northern Trust Bank in Miami by making a deposit of $45,000.

These "other violations" were admitted into evidence at the trial.

---

3. Paez was a named defendant in the indictment. The DEA videotaped this transaction, and Dean received a $3,000 commission.

4. After this last meeting, a series of telephone conversations took place. Lester Rogers advised Navarro that Darias was an informer, that her telephones were wiretapped, and that the grand jury would return an indictment. Navarro then threatened Darias's family. Subsequently, the government convicted Navarro of Travel Act and narcotics violations.

## PROCEDURAL HISTORY

On October 14, 1982, in a fourteen-count indictment, a grand jury charged Alvarez–Moreno, Ricardo Jatter, Said Pavon Jatter, and seventeen codefendants with criminal violations. The indictment named Alvarez–Moreno in six counts:

1. Count I, conspiracy to violate the Travel Act in violation of 18 U.S.C. §§ 371 and 1952;

2. Count X, conspiracy to import cocaine into the United States in violation of 21 U.S.C. §§ 952(a) and 963;

3. Count XI, conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846;

4. Count XII, using a communication facility in the commission of a conspiracy to distribute cocaine in violation of 21 U.S.C. § 843(b);

5. Count XIII, using a communication facility in the commission of a conspiracy to import cocaine in violation of 21 U.S.C. § 843(b); and

6. Count XIV, engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848.

As to Ricardo and Said Jatter (Jatter brothers), the grand jury charged them in Counts I, X, and XI of the indictment.

## EXTRADITION

On February 25, 1985, the Colombian government ordered the extradition of Alvarez–Moreno and the Jatter brothers from Colombia to the United States. Pursuant to the extradition order, the Colombian government prohibited the United States from putting them to trial on Travel Act violations (Count I), and using communication facilities for drug distribution (Counts XII and XIII). Consequently, the United States agreed that Alvarez–Moreno would be tried only on Counts X, XI, and XIV; the United States also agreed to try the Jatter brothers only on Counts X and XI of the indictment. The case then proceeded under a redacted and renumbered indictment.

In the redacted indictment, Count I (formerly Count X) charged Alvarez–Moreno and the Jatter brothers with conspiracy to import cocaine in violation of 21 U.S.C. § 963; Count II (formerly Count XI) charged each of them with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846; and Count III (formerly Count XIV) charged only Alvarez–Moreno with engaging in a CCE in violation of 21 U.S.C. § 848. The revised CCE count alleged that the continuing series of violations encompassed Counts I and II of the redacted indictment.

On February 10, 1986, the trial commenced. The jury convicted Alvarez–Moreno and the Jatter brothers on all counts of the indictment. On June 26, 1986, the district court sentenced Alvarez–Moreno to ten years imprisonment for conspiracy to import cocaine, ten years imprisonment for conspiracy to possess cocaine with the intent to distribute, and twenty-five years imprisonment for the CCE violation, the sentences on the three counts to run consecutively. The court further ordered that Alvarez–Moreno pay a fine of $25,000 on each of Counts I and II, and $100,000 on Count III, as well as one-third of the cost of prosecution.

The district court sentenced both Said and Ricardo Jatter to seven year terms of imprisonment on each of Counts I and II, to be served concurrently. The court further ordered them to pay fines of $25,000 on each count.

## ISSUES

The issues are: (1) Whether the government presented sufficient evidence to sustain a conviction under the CCE statute; (2) whether the district court constructively amended the indictment when it considered uncharged offenses; (3) whether the district court properly instructed the jury on conspiracy; (4) whether the district court violated the extradition treaty when it admitted evidence of Alvarez–Moreno's arrest and prior money seizures; and (5) whether the district court improperly sentenced Alvarez–Moreno.

## DISCUSSION

In evaluating challenges to the sufficiency of evidence, we must determine whether the evidence, viewed in the light most favorable to the government, establishes guilt beyond a reasonable doubt. The evidence need not be wholly inconsistent with every reasonable hypothesis except that of guilt. *United States v. Rosenthal*, 793 F.2d 1214, 1225 (11th Cir.1986), *opinion modified in part*, 801 F.2d 378 (1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir.1984), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *see also, United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[5] This court must also give deference to the fact finders reasonable inferences and credibility choices. *Sanchez*, 722 F.2d at 1505; *United States v. Gonzalez*, 719 F.2d 1516, 1521–22 (11th Cir.1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 710 (1984).

### Alvarez–Moreno's CCE Count

Alvarez–Moreno contends that his CCE conviction should be reversed because the government failed to prove three separate and independent violations in accordance with the statute. The district court held for the government ruling that the evidence produced at trial established a continuing series of violations.

In *Rosenthal*, this court addressed the components of a continuing criminal enterprise violation under 21 U.S.C. § 848.

A person is considered to have engaged in a continuing criminal enterprise if he violates any provision of 21 U.S.C. §§ 801, et seq., governing drug abuse prevention and control, in the course of a continuing series of like violations undertaken in concert with five or more other persons 'with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management,' as a result of which that person obtains substantial income or resources.

*Rosenthal*, 793 F.2d at 1225–26 (quoting *United States v. Bascaro*, 742 F.2d 1335, 1357 (11th Cir.1984)); *see also, United States v. Becton*, 751 F.2d 250, 254 (8th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). We have interpreted "a continuing series of violations" to encompass three or more violations. *Rosenthal*, 793 F.2d at 1226 (citing *United States v. Brantley*, 733 F.2d 1429, 1436 (11th Cir.1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985)); *U.S. v. Graziano*, 710 F.2d 691, 697 n. 11 (11th Cir.1983).

Alvarez–Moreno contends that the CCE statute is not satisfied unless three separate predicate violations are charged as counts in the indictment. A review of case authority reveals otherwise. In *Rosenthal*, we noted that "[c]ourts in other circuits have consistently held that use of such unindicted offenses is permissible in obtaining a conviction under § 848." *Rosenthal*, 793 F.2d at 1226; *United States v. Markowski*, 772 F.2d 358, 361–62 (7th Cir. 1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986); *Becton*, 751 F.2d at 256; *United States v. Young*, 745 F.2d 733, 747 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Sterling*, 742 F.2d 521, 526 (9th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); *Sperling v. United States*, 692 F.2d 223, 226 (2d Cir.1982), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). The violations need not be charged or even set forth as predicate acts in the indictment. *Young*, 745 F.2d at 747 (citing *United States v. Michel*, 588 F.2d 986, 1000 n. 15 (5th Cir.1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979)). The law only requires evidence that the defendant committed three sub-

---

5. The Eleventh Circuit has adopted as binding precedent decisions of Unit B of the former Fifth Circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982).

In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (in banc), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the Fifth Circuit issued before October 1, 1981.

stantive offenses to provide the predicate for a section 848 violation, regardless of whether such offenses were charged in counts of the indictment or in separate indictments. *Rosenthal*, 793 F.2d at 1226 (quoting *Sperling*, 692 F.2d at 226).[6] Additionally, in *Rosenthal*, we found the reasoning of the Second Circuit in *Markowski* persuasive. In *Markowski*, the court noted that:

> The language of section 848(b)(2) refers to a "continuing series of violations" of the drug laws but does not define "violation". Several courts have understood "violation" to refer to an offense, whether or not the offense led to conviction. As the Supreme Court emphasized in *Garrett*, 105 S.Ct. at 2412–15 [*Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985)] the CCE statute is not a sentence enhancement provision or an aggravated version of an offense. It is a distinct crime that entails the supervision of a substantial criminal enterprise. *What is important is proof that there was indeed a far-flung operation. Whether this has led to other convictions is all but irrelevant to the nature of the CCE offense.* This leads us to interpret "violation" in the natural way as an offense, not as a conviction. [Emphasis added.]

*Rosenthal*, 793 F.2d at 1227 (quoting *Markowski*, 772 F.2d at 361).

Notwithstanding this authority, Alvarez–Moreno argues that the jury improperly considered evidence of overt acts which were not the subject of any count in the indictment in order to satisfy the CCE "series" requirement. This court has previously held that an overt act in violation of the drug laws may be used as a section 848 predicate offense, even if such act is not the basis for a separate count and conviction. *Brantley*, 733 F.2d at 1436 n. 14 (citing *United States v. Johnson*, 575 F.2d 1347, 1357 (5th Cir.1978), *cert. denied*, 440

U.S. 907, 99 S.Ct. 1213, 1214, 59 L.Ed.2d 454 (1979)); *see also Rosenthal*, 793 F.2d at 1226.

▪ Alvarez–Moreno attempts to distinguish this case noting that in *Rosenthal* three violations were listed in the indictment as compared to only two violations in the indictment in this case. To support his contention that an indictment must articulate three violations as predicate acts, Alvarez–Moreno cites *United States v. Rivera*, 837 F.2d 906 (10th Cir.), *reh'g granted in part*, 847 F.2d 660 (1988). His reliance on *Rivera* is misplaced. Following the decisions of several circuits that had considered the requisite elements for a CCE violation, the *Rivera* court concluded that the continuing series element requires proof of at least three narcotics violations. *See Rivera*, 837 F.2d at 915 n. 6 (citing *United States v. Ricks*, 776 F.2d 455, 463 n. 13 (4th Cir.1985)). Nevertheless, the *Rivera* court carefully tailored its holding. The court stated:

> We do not, however, mean to imply that only proof of convictions satisfies the continuing series element. The precise statutory language is "continuing series of violations." ... If the prosecution proves an uncharged offense beyond a reasonable doubt, such offense may constitute one of the three requisite offenses sustaining a CCE charge. [Citations omitted.]

*Rivera*, 837 F.2d at 915 n. 7 (citing *Markowski*, 772 F.2d at 361)); *Young*, 745 F.2d at 747. Thus, even the *Rivera* court noted that uncharged offenses may constitute one of the three requisite offenses in a CCE charge.[7] As stated earlier, "violations" rather than "convictions" are the necessary components of the continuing series requirement. *Markowski*, 772 F.2d at 361; *Rosenthal*, 793 F.2d at 1227. The CCE statute is not a sentence enhancement

---

**6.** In his brief, Alvarez–Moreno mentions the fact that Counts I and II of the redacted indictment were both conspiracies. This court has held that a conspiracy offense may be part of the foundation of a section 848 charge. *Rosenthal*, 793 F.2d at 1227; *Brantley*, 733 F.2d at 1436 n. 14.

**7.** We note, however, that in *Rivera*, the Tenth Circuit granted rehearing in banc to address the question whether the sixth amendment and due process clauses require an indictment charging a CCE to allege all offenses to be used at trial.

provision; rather, "[i]t is a distinct crime that entails the supervision of a substantial criminal enterprise. What is important is proof that there was indeed a far-flung operation. Whether this has led to other convictions is all but irrelevant to the nature of the CCE offense." *Rosenthal*, 793 F.2d at 1227 (citing *Markowski*, 772 F.2d at 361). In this case, the numerous transactions and offenses proved at trial more than satisfied the series requirement. The district court correctly allowed proof of unindicted offenses to establish the CCE violation.

Further, we are persuaded that the evidence refutes the appellants characterization of the twenty-one money transactions as one continuous transaction. Describing her constituency as "powder people," Navarro, acting as intermediary for Alvarez–Moreno, developed a daily line of communications and money transactions with Darias, a government informant. Each money delivery involved one or more of Alvarez–Moreno's accomplice's representing separate and distinct transactions, and the fruits of separate illegal narcotics sales. The government produced voluminous evidence of a widespread drug enterprise culminating a fourteen month investigation. Navarro and others channeled $4.5 million dollars to Dean Investments for conversion. The evidence revealed that Said Jatter, Ricardo Jatter, Oscar Garcia, and Carlos Alvarado, among others, were closely connected to Alvarez–Moreno; however, their roles were not necessarily the same. The cocaine transactions were separate in time, location, and clientele. Several participants enjoyed business and geographic autonomy. For example, Said Jatter, operating in Denver, Colorado, distributed cocaine to his Denver clients; however, Garcia and Ricardo Jatter operating in the Los Angeles area, distributed cocaine to California clients. The appellants' argument that the financial transactions constituted one continuous offense lacks merit.

Further, the appellants' argument that the government failed to link their money laundering activities to drug activity is frivolous. Numerous negotiations involving the distribution of cocaine took place throughout the time period alleged in the indictment. The three hundred (300) telephone conversations between Alvarez–Moreno and his coconspirators, the videotaped transactions at Dean, the conversations with Navarro, and the numerous attempted cocaine sales to Darias, provide unrefutable evidence that the cocaine sales were the source of the illegal funds.

### Sufficiency of the Indictment

Alvarez–Moreno also contends that because the district court permitted the government to prove uncharged offenses to establish the CCE series requirement, it effectively amended the indictment, thereby violating fifth and sixth amendment rights. The government counters that the use of uncharged narcotics offenses will not necessarily invalidate a conviction or constitute an amendment of an indictment.

This court is mindful of the constitutional importance of protecting the sanctity of the grand jury indictment process. Notice and constitutional safeguards are so fundamental that indictment procedures must be adhered to in order to insure a fair trial. *U.S. v. Peel*, 837 F.2d 975, 979 (11th Cir. 1988) (citing *United States v. Carroll*, 582 F.2d 942, 944 (5th Cir.1978)). We have held that constructive amendment of a grand jury indictment is reversible error per se. *Peel*, 837 F.2d at 979; *Carroll*, 582 F.2d at 944–45.

Essentially, an amendment to an indictment occurs "when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them." *Peel*, 837 F.2d at 979 (quoting *United States v. Lignarolo*, 770 F.2d 971, 981 n. 15 (11th Cir.1985), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986)). Due process dictates that an indictment afford a defendant notice of the charges so that the defendant can prepare an adequate defense. An indictment charging a CCE is sufficient for constitutional purposes if it articulates in statutory language the elements of the violation. *Johnson*, 575 F.2d at 1356; *United States*

v. *Sperling*, 506 F.2d 1323, 1344 (2d Cir. 1974); *U.S. v. Martinez–Torres*, 556 F.Supp. 1255, 1275 (S.D.N.Y.1983); *see also, United States v. Harrell*, 737 F.2d 971, 975 (11th Cir.1984), *cert. denied*, 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985); *United States v. Strand*, 566 F.2d 530, 534 (5th Cir.1978).

In *Sperling*, the defendant challenged the sufficiency of an indictment charging him with a CCE violation in part "because it failed to specify each violation constituting the continuing series of violations proscribed by statute." *Sperling*, 506 F.2d at 1344. The court noted:

> These contentions are wholly devoid of merit. Count Two [the continuing criminal enterprise count] tracks the statutory language. It contains every element of the offense charged. It satisfies the requirement that the defendant be given notice of the charges against him so that he can prepare his defense and plead the judgment in bar of any future prosecution for the same offense.

*Sperling*, 506 F.2d at 1344 (citation omitted). The *Sperling* court further noted that "[Section] 848 is aimed at 'the business of trafficking in the prohibited drugs on a continuing, serious, widespread, supervisory and substantial basis.'" (citation omitted); *see also, Martinez–Torres*, 556 F.Supp. at 1275 (where the court applied *Sperling* and held the defendant's due process rights were not violated when a jury relied on non-specified drug violations to support a CCE). The government is not required to provide a defendant with all the overt acts that might be introduced at trial. *Rosenthal*, 793 F.2d at 1227.

■ In this case, the indictment apprised Alvarez–Moreno of the nature of the government's case and afforded him an opportunity to prepare a defense. Both the unredacted and redacted indictments adequately articulate the relationships between Alvarez–Moreno, the narcotics importation, and the proceeds resulting therefrom. Further, the statutory language in the indictment contains every element of the CCE offense charged. *See Johnson*, 575 F.2d at 1356; *Sperling*, 506 F.2d at 1344; *see also, Harrell*, 737 F.2d at 975.[8]

Moreover, because Alvarez–Moreno had actual notice, and because he failed to show surprise or object to the indictment, no prejudice can be demonstrated from the government's failure to specifically state the underlying felonies in the indictment. *Becton*, 751 F.2d at 256–57. "[I]f a defendant has actual notice of the charges, due process may be satisfied despite an inadequate indictment." *Becton*, 751 F.2d at 256 (citing *Goodloe v. Parratt*, 605 F.2d 1041, 1045–46 (8th Cir.1979)). The information contained in the original unredacted indictment and the redacted indictment afforded the appellants notice of the underlying felonies. The overt acts in the original unredacted indictments specifically referred to the "David Jaffee" money delivery, the "Oscar Garcia" transactions, and the Denver incident involving Said Jatter. Both the redacted and unredacted indictments adequately set forth the requisite relationships between Alvarez–Moreno, the narcotics importation, and the proceeds resulting therefrom.

Further, we reject the appellant's contention that the government altered its theory from a narcotics conspiracy to a money laundering case. We find no shift in the government's theory of prosecution. The pretrial memoranda, and both the unredacted and redacted indictments articulated the government's position that the money was the alter-ego of the drugs. The government's theory was that Alvarez–Moreno, through the Jatter brothers, Garcia, Alvarado, and others, distributed cocaine into the United States and funneled the cocaine proceeds to Dean Investments. No variance in this theory existed.

---

**8.** Count III in the redacted indictment states in relevant part that:

> JOSE JADER ALVAREZ–MORENO, a/k/a CARLOS JADER ALVAREZ in concert with at least five (5) other persons with respect to whom the aforesaid defendants occupied a position of organizer, supervisor, and manager, and from which continuing series of violations the aforesaid defendants obtained substantial income and resources.

The unredacted indictment contains similar language.

### Jury Instructions

Alvarez–Moreno also contends that even if the series requirement of a CCE violation could be satisfied through acts that were part of an overall conspiracy, the district court failed to properly instruct the jury on the essential elements of predicate offenses. Alvarez–Moreno argues that the district court never advised the jury that it needed to find three "separate and independent" narcotics violations, thereby effectively directing a verdict on the CCE charge once the jury found him guilty on Counts I and II of the indictment. We find no error in the district court's instructions.[9]

In *Sterling*, the court rejected a similar challenge to a CCE jury instruction. *Sterling*, 742 F.2d at 526. The *Sterling* court instructed the jury that:

> [T]hey must find beyond a reasonable doubt, first, that the defendant committed a predicate offense—some or all of the offenses listed in the indictment; and second, "that the offenses listed above were *part* of a continuing series of violations by defendant Sterling of the Federal narcotic laws." [Emphasis added.]

The court in *Sterling* noted that the instructions informed the jury that the offenses listed in the indictment "need only be a *part* of the continuing series of violations, not that *only* offenses listed in the indictment could be considered in determining whether a series of violations had occurred." *Sterling*, 742 F.2d at 526 (emphasis in original).

The *Sterling* court further observed that the government presented ample evidence of drug violations during the indictment period for a jury to find beyond a reasonable doubt that defendant committed indicted and unindicted felony drug violations. *Sterling*, 742 F.2d at 526. As in *Sterling*, the district court in this case also instructed the jury that "such violations were a *part* of a 'continuing series of violations'...." (emphasis added). The record indicates that the government provided ample evidence for the jury to find that Alvarez–Moreno committed numerous felony violations of the drug laws over a number of years, including those for which the grand jury indicted. *See Sterling*, 742 F.2d at 526. The question nonetheless remains whether the charge considered as a whole is so clearly erroneous as to result in a likelihood of a miscarriage of justice. *United States v. Pepe*, 747 F.2d 632, 675 (11th Cir.1984); *United States v. Thevis*, 665 F.2d 616, 645 (5th Cir. Unit B 1982), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). We hold that the district court committed no error in charging the jury, and that the language of the instructions correctly states the law.

Moreover, as we noted earlier on the indictment question, Alvarez–Moreno has effectively waived any objection to the jury instructions because he failed to challenge the instructions. *See Becton*, 751 F.2d at 257 (where the court upheld jury instructions even though the government failed to specify the alleged felonies underlying the CCE charge); *see also*, Fed.R. Crim.P. 30.

We likewise dismiss appellants Ricardo and Said Jatter's contention that the district court's refusal to use their proposed jury instructions denied them a fair trial. Essentially, the Jatter brothers ar-

---

9. The district court instructed the jury in pertinent part as follows:

Title 21, United States Code, Section 848, makes it a Federal crime or offense for anyone to engage in what is called a "continuing criminal enterprise" involving controlled substances.

The Defendant Jose Jader Alvarez–Moreno, can be found guilty of that offense only if all the following facts are proved beyond a reasonable doubt:

*First:* That the defendant violated the Federal Narcotics Laws as charged in counts I and II of the indictment, respectively;

*Second:* that such violations were a *part* of a "continuing series of violations," as hereafter defined; ...

A "continuing series of violations" means proof of at least three violations of the Federal controlled substances laws as charged in Counts I and II of the indictment, and also requires a finding that those violations were connected together as a series of related or on-going activities as distinguished from isolated and disconnected acts. [emphasis added].

gue that the district court's failure to distinguish for the jury the difference between aiding and abetting a conspiracy and conspiracy to aid and abet requires a reversal. In *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir.1986), this court held that a defendant "is entitled to have presented instructions relating to a theory of defense for which there is *any foundation* in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *Lively*, 803 F.2d at 1126 (citing *United States v. Young*, 464 F.2d 160, 164 (5th Cir.1972) (quoting *Tatum v. United States*, 190 F.2d 612, 617 (D.C.Cir.1951)) (emphasis in original). Nevertheless, we further noted that "[e]ven if a requested jury instruction is proper, the trial court has some discretion in framing the instruction. If the charge to the jury adequately and correctly covers the substance of the requested instruction, there is no reversible error." *Lively*, 803 F.2d at 1128 (citing *United States v. Stone*, 702 F.2d 1333, 1339 (11th Cir.1983).

In this case, a review of the jury instruction reveals that the district court seized the essence of the Jatters' proposed instruction. Indeed, the district court effectively diminished the Jatters' concern between the distinction of aiding and abetting a conspiracy and conspiracy to aid and abet. In its last paragraph, the district court instructed that:

> [M]ere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other, and may have assembled together and may have discussed with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of a conspiracy. Also, a person who has no knowledge of a conspiracy, *but who happens to act in a way which advances some purpose of one*, does not thereby become a conspirator. [Emphasis added.]

Thus, the district court eliminated any confusion as to the proposed conspiracy instructions. Because district courts must be afforded discretion in framing instructions, and because the charge to the jury adequately covered the essence of the proposed instruction, we find no reversible error. *See Lively*, 803 F.2d at 1128.

### Violations of Extradition Order

The Jatter brothers contend that the introduction of money laundering evidence violated the extradition order. Similarly, Alvarez–Moreno contends that evidence of his Colombian arrest, and the Opa–Locka and Northern Trust Bank incidents breached provisions of the extradition treaty. We disagree. Article 15(1) of the treaty between the United States and the Republic of Colombia provides that:

> A person extradited under the Treaty shall not be detained, tried or punished in the Requesting State for an offense other than that for which extradition has been granted....

Article 15(2) further mentions that:

> If the offense for which the person was extradited is legally altered in the course of proceedings, that person may be prosecuted or sentenced provided:
>
>> (a) The offense under its new legal description is based on the same set of facts contained in the extradition request and its supporting documents, and
>>
>> (b) the defendant is subject to be sentenced to a period of incarceration which does not exceed that provided for the offense for which that person was extradited.

This article, which envisions the essence of the doctrine of specialty, does not support appellants' argument.[10] Neither the doctrine of specialty nor the articulation of article 15 lends support to the appellants' argument that the evidence obtained is inadmissible to prove their respective roles in

---

**10.** "The 'principle of specialty,' long recognized in international law, provides that 'the requisitioning state may not, without the permission of the asylum state, try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited.'" *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir. 1973); *see generally*, 1 Moore, Extradition 194–259 (1891).

the enterprise. When a grand jury indicts a defendant, and the defendant is tried for the precise offense contained in the extradition order, the doctrine of specialty does not purport to regulate the scope of proof admissible in the judicial forum of the requisitioning state. *United States v. Flores*, 538 F.2d 939, 944 (2d Cir.1976); *see also, United States v. Archbold–Newball*, 554 F.2d 665, 685 (5th Cir.), *cert. denied*, 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977) (where the court allowed introduction of evidence to prove a conspiracy count holding that the doctrine of specialty does not permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state).

In this case, the district court had broad discretion in determining the admissibility of evidence. At pre-trial, the government argued that the Opa–Locka seizure, and the Colombian arrest were admissible as extrinsic evidence under Fed.R.Evid. 404(b). The court then admitted the evidence of the Colombian arrest finding that it "was inextricably intertwined with the charged offense." Before the government introduced evidence concerning Alvarez–Moreno's Colombian arrest, the government also argued that the Colombian arrest was relevant to the narcotics conspiracies charged in the indictment because it occurred during the time period charged. Agreeing with the government, the district court invited counsel to prepare limiting instructions. The court advised the jury that the Opa–Locka evidence was not to be considered against the Jatter brothers. "[W]e will not disturb the [district] court's evidentiary rulings unless the court has clearly abused its discretion." *United States v. Champion*, 813 F.2d 1154, 1172 (11th Cir.1987); *Rosenthal*, 793 F.2d at 1241.

The district court admitted the evidence to reflect the scope of the conspiracies, to prove intent, and to aid the jury in determining the nature of the offenses charged. Given this fact, no violation of the extradition treaty exists. *See Flores*, 538 F.2d at 944; *Archbold–Newball*, 554 F.2d at 684–85.

## Sentencing

The district court sentenced Alvarez–Moreno to a twenty-five (25) year term of imprisonment on the CCE count; ten (10) years imprisonment for conspiracy to import cocaine; and ten (10) years imprisonment for conspiracy to possess with intent to distribute cocaine, to run consecutively. Alvarez–Moreno correctly argues and the government concedes that it is improper to sentence him with consecutive terms on the CCE count and the two conspiracies because the conspiracy counts merged with his CCE conviction. *See Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987); *see also, Garrett*, 471 U.S. at 794, 105 S.Ct. at 2419.

Section 848 provides for penalties including life imprisonment. *See* 21 U.S.C. § 848(a)(i). Rather than sentencing Alvarez–Moreno to life, the district court structured a consecutive scheme for a total of forty-five (45) years. When a sentencing scheme is disrupted because the district court "has incorporated an illegal sentence, it is appropriate that the entire case be remanded for resentencing." *United States v. Lail*, 814 F.2d 1529, 1530 (11th Cir.1987) (quoting *United States v. Rosen*, 764 F.2d 763, 767 (11th Cir.1985), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 806, 88 L.Ed. 2d 781 (1986)). As we stated in *Lail*, multiple count convictions present a district judge with the duty to produce a sentencing scheme which considers the total offenses and the defendant's behavior. *Lail*, 814 F.2d at 1529. To simply vacate the conspiracy counts would thwart the district court's intent. We deem it appropriate that the case be remanded for resentencing.

Accordingly, the convictions, judgments, and sentences of Ricardo Jatter and Said Jatter are affirmed. The conviction of Alvarez–Moreno is affirmed, but his case is remanded for resentencing.

AFFIRMED AND PARTIALLY REMANDED FOR RESENTENCING.

CLARK, Circuit Judge, specially concurring:

There is no doubt that to convict a defendant of continuing criminal enterprise (CCE) under 21 U.S.C. § 848, the government must prove that the defendant has committed three or more violations of the drug laws. These violations need not have resulted in convictions if the government proves them beyond a reasonable doubt. *United States v. Rosenthal,* 793 F.2d 1214 (11th Cir.), *modified in part,* 801 F.2d 378 (1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). The difficult issue in this case concerns the extent to which the government may use acts not specifically charged in the indictment to prove the continuing series element of CCE. Despite the majority's assertion to the contrary, this is an open question in this circuit. I write separately to explain how I believe it should be answered in this case.

The redacted indictment charging Alvarez–Moreno with CCE did not set out the three violations necessary to support a CCE conviction. The appellant argues that the government introduced evidence concerning the Opa Locka airport incident, the Northern Trust Bank incident and Alvarez–Moreno's arrest in Colombia as the three underlying violations. The appellant misconstrues the government's position. The government supported the underlying series element through proof of over twenty-one drug and financial transactions. The airport and bank incident were admitted under Federal Rule of Evidence 404(b) to prove intent. The facts surrounding the Colombian arrest were introduced as evidence of the charged conspiracy. Proper limiting instructions were given so the jury would not have considered these acts to support the continuing series element.

The real issue in this case is whether the indictment gave Alvarez–Moreno sufficient notice of the acts which the government would use to prove the CCE count. Due process requires that an indictment give notice to a defendant of the elements of the charge so that he can prepare an adequate defense. *United States v. Becton,* 751

F.2d 250, 256 (8th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). The CCE count in the redacted indictment asserts that Alvarez–Moreno imported cocaine and laundered money. Neither that count nor the other two counts give any further notice of the specific acts of cocaine importation or money laundering the government would prove to support a CCE conviction. For this reason, I do not believe *United States v. Rosenthal* controls this case. In *Rosenthal,* the defendant challenged his conviction for CCE because the CCE count in the indictment did not separately charge the underlying violations. However, the violations were charged as overt acts under the RICO count. 793 F.2d at 1226; *see Becton,* 751 F.2d at 256 (since violations charged in other counts, defendant had notice). This case differs from *Rosenthal* and other cases cited by the majority because the redacted indictment gave no notice of the specific acts the government would prove to support the continuing series element. *Compare United States v. Rivera,* 837 F.2d 906, 919 (10th Cir.) (no counts of indictment gave defendant notice that government would use acts to support continuing series element), *reh'g en banc granted* 847 F.2d 660 (1988) *with United States v. Sterling,* 742 F.2d 521, 523 (9th Cir.1984) (indictment had eleven counts), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); *United States v. Michel,* 588 F.2d 986, 1000 n. 15 (5th Cir) (defendant convicted of six counts of narcotics violations incorporated in the CCE count), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Sperling,* 506 F.2d 1323, 1344 (2d Cir.1974) (although indictment gave no notice of violations, government gave defendant a bill of particulars), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).

The facts of this case, however, reflect that Alvarez–Moreno had actual knowledge of the acts the government intended to use to prove the continuing series element. In this case, the original indictment listed specific money laundering transactions as overt acts in the Travel Act count (Count I). That count was omitted from the "re-

dacted indictment" pursuant to restrictions in the Extradition Order. It appears from the record, however, that, with the parties' consent, the "redacted indictment" was not prepared until the final day of trial (May 8, 1986). 1st Supp.Rec., Vol. 3, at 199–200. Thus the preparation of the "redacted indictment" was a mere formality to conform with the Extradition Order and the proof at trial. The fact that the defendant proceeded through the entire trial without the "redacted indictment" belies any suggestion that the defendant was lead to believe that the government would not use the facts alleged in Count I of the original indictment at trial. Alvarez–Moreno has never claimed surprise or prejudice because of the introduction of that evidence and in oral argument, defense counsel conceded that he had notice that the government intended to prove the continuing series through evidence of the drug and financial transactions. "If a defendant has actual notice, due process may be satisfied despite an inadequate indictment." *Becton*, 751 F.2d at 256. Therefore *Rosenthal* and the other cases cited by the majority at page 1408 are relevant only to the extent that the defendants had actual notice through other counts of the indictment of the acts the government intended to prove to support the CCE count.[1]

In the absence of such actual notice, however, an indictment which merely tracks the statutory language and does not specify the violations which will support CCE is inadequate. Since that is not the issue here, I only briefly mention several reasons such an indictment is insufficient.[2] First, as pointed out above, due process entitles the defendant to notice of the charges against him so that he can prepare his defense. Merely citing the statutory language of CCE is insufficient because it does not provide the " 'facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." ' *Russell v. United States*, 369 U.S. 749, 765, 82 S.Ct. 1038, 1048, 8 L.Ed.2d 240 (1962) (citation omitted). In addition, the prosecutor gains an unfair advantage in being "free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." *Id.* at 768, 82 S.Ct. at 1049. Furthermore, the lack of specific notice may hamper the ability of all parties to ensure that the defendant is not placed in jeopardy twice for the same offense. *Id.* at 765, 82 S.Ct. at 1047. Finally, the failure to allege specific acts in the indictment runs the risk that the jury will convict based on evidence that was not presented to the grand jury. *See id.* at 770, 82 S.Ct. at 1050–51. Whether such a situation constitutes a constructive amendment, which is prejudicial per se, or a variance, which requires a showing of prejudice, will depend on the specifics of the case. In either event, the potential for prejudice to the defendant is clear. I therefore agree with the *Becton* court that the government should allege the specific violations it will prove in the CCE count itself.

In this case, I am persuaded by the record that the defendant's actual notice of the events the government intended to prove ensured that he suffered no prejudice. In addition, it is clear that the evidence of the money laundering transactions was presented to the grand jury. Alvarez–Moreno's conviction must be affirmed.

---

1. In each of these cases, the defendant was on notice of the violations the government proved to support the CCE conviction. The language of the majority opinion at page 1408, when read in isolation, however, suggests that a defendant need not be notified of the acts which will constitute the "continuing series" element. Later, the majority does acknowledge that Alvarez–Moreno had notice of these acts. Majority opinion at 1411. This special concurrence is written out of concern that a later panel might view the language at page 1408 to be the holding in this case.

2. These concerns are cogently explained in *United States v. Rivera*, 837 F.2d at 917–20.